## TAYLOR AND QUARLES v. BROWN.

The first survey, under a military land warrant in Virginia, gives the prior equity. The survey is the act of appropriation.

The certificate of survey is sufficient evidence that the warrant was in the hands of the surveyor.

ERROR to the district court for the Kentucky district, in a suit in chancery, wherein Taylor and Quarles were complainants against Brown. The bill of the complainants was dismissed by the court below.

Both parties claimed under military warrants upon the king's proclamation, for services rendered prior to the year 1763.

The complainants claimed under a warrant in favour of *Angus M'Donald,* for 2,000 acres issued

the 5th of February, 1774. The defendan, claimed under a warrant in favour of *Jethro Sumner*, for 2,000 acres, issued the 3d of December, 1773. M'Donald's survey was made on the 7th of July, 1774. Sumner's was made on the 24th of June, 1775; and he obtained a patent on the 5th of January, 1780. The patent upon M'Donald's survey, was not issued until the 10th of January, 1792; so that the complainants had a younger warrant and patent, but the elder survey. The defendant had the elder warrant and patent, but the younger survey. M'Donald's survey included 3,025 acres; Sumner's included, 2,576 acres. The quantity covered by both surveys was 1,080 acres, of which Taylor claimed 660, and Quarles, 200; it did not appear who claimed the other 220 acres, included in the interference.

M'Donald's survey was made by Hancock Taylor, an assistant surveyor of Fincastle county, where the lands lay, who, before his return to the office, was killed by the Indians on the last of July, 1774, but his field-books and papers were preserved by his attendants, and delivered to the principal surveyor of the county, in September, 1774, who made out a plat therefrom.

The complainants' bill charges, that the survey of Sumner was *fraudulently* made, so as to interfere with M'Donald's. The answer denies the fraud; and there was no evidence of fraud, or even of notice on the part of Sumner.

*P. B. Key* and *Rowan*, for the complainants, (the plaintiffs in error,) contended, that the survey made by Hancock Taylor, and the plat and certificate of survey made out by the principal surveyor, were a good execution of the warrant, and were a complete appropriation of the land surveyed, so as to give to M'Donald a prior title in equity; and that the subsequent patent related back to the survey, so as to give to the complainants a better title in equity than the defendants

TAYLOR v. BROWN.

That clause of the land law of Virginia, which requires every survey to be recorded within two months after it is made, is merely *directory* to the surveyor; and his neglect to record it does not invalidate the survey.

It is not necessary that the deputy surveyor who made the survey, should make out the plat and certify it. It may be done from his notes, by the principal surveyor.

A subsequent locator of land in Virginia, without notice of the prior location, cannot protect himself by obtaining the elder patent.

A survey is not void because it includes more land than was directed to be surveyed by the warrant.

The patent relates to the inception of title; and therefore, in a court of equity, the person who has first appropriated the land has the best title, un-

less his equity is impaired by the circumstances of the case —

The locator of a warrant undertakes himself to find *waste* and *unappropriated* land, and his patent issues upon his own information to the government, and at his own risk. He cannot be considered as a purchaser without notice.

The equity of the prior locator extends to the surplus land surveyed, as well as to the quantity mentioned in the warrant.

*Pope* and *Swann*, contra, contended,

1. That it did not appear that M'Donald's war-rant ever was in the hands of the surveyor.

2. That the survey was not recorded within two months after it was made.

3. That the survey was not certified by Hancock Taylor, the assistant surveyor who made the survey.

4. That the complainants had a remedy by *caveat;* and having neglected to avail themselves of that remedy, they could not have relief in equity.

5. That the survey, both in law and equity, was void as to all but 2,000 acres.

6. That the complainants have no equity.

1. Upon the first point it was said that the war-rant is the only authority for the officer to survey the land; and if he never had the warrant, the whole proceeding is void. It must be proved, therefore, that the officer had the warrant.

2. The act of 1778, c. 14. § 6. requires that every survey shall be recorded by the surveyor, in a book kept by him for that purpose, within two months after the same shall be made. This was a condition precedent to the validity of the survey.

3. The survey was not certified by Hancock Taylor, the assistant surveyor who made the sur-vey.

It is an incontrovertible position, that when the law entrusts an officer to do an act *in pais*, he is the only person who can certify the act done. A deputy surveyor, or a deputy sheriff does not de-rive his authority from the principal surveyor, or the high sheriff, but from the law. The principal has only the appointment of the deputy; but his

authority to act as, and for the principal, is derived
from the law.    There can be no evidence of a sur-
vey, but the certificate of the officer who made it.
If a man went to make a settlement, but should be
killed on the way, it is true, the act of God pre-
vented, but still it was no settlement.

TAYLOR
v.
BROWN.

4. The complainants had a remedy by *caveat*,
when they might have established their title at law.
Having lost this remedy by their own negligence,
it is contrary to the principles of equity to aid them.

5. The survey was void as to the surplus, beyond
the 2,000 acres authorized by the warrant.    As to
this surplus M'Donald was a mere volunteer; he
paid no consideration; it was a fraud upon the
state; and a mere survey, without the authority of
a warrant, can give no title in equity.  *Hughes's Rep.*
21. 26.  *Dougherty* v. *Crow.    Sneed's Kentucky
Cases*, 9.  *Ward* v. *Kenton.    Sugd.* 200, 201, 202.
1 *Fonb.* 348.

6. The complainants have no equity.  The defend-
ant was a purchaser for a valuable consideration
without notice of any title or claim by M'Donald.
No fraud or notice is brought home to Sumner.
He purchased the land fairly; he has paid for it and
obtained the legal title; and he must hold it until
some other person shows a better title in equity.

There is no evidence of notice, even if the depo-
sitions can be read which are sent up with the re-
cord; of which there is strong doubt; for the jury,
according to the practice in Kentucky, has found
all the facts in dispute between the parties.

Even if one of the depositions should contradict
the answer, yet a court of equity will never decree
against the defendant's answer, upon a single depo-
sition, unless it be strongly corroborated by circum-
stances.

TAYLOR
v.
BROWN.

[LIVINGSTON, J. Are those the depositions upon which the jury acted in finding the facts? If they are, I, for myself, should consider the finding conclusive; and that we could not look into the depositions.

MARSHALL, Ch. J. When the first case of a suit in chancery of this kind came before this court from Kentucky, the court was struck with the irregularity of the intervention of a jury to ascertain the facts in any other mode than by an issue directed by the court as a court of chancery; and as this court is only authorized to proceed in chancery-cases according to the principles and usages of courts of equity, the court was disposed to disregard facts thus found.

The court felt no difficulty in looking into the depositions, but their doubt was, whether they should take into consideration the facts found. However, as such a practice was said to have been established in Kentucky, the court agreed to look into the facts found where they were not inconsistent with the depositions in the cause. I think the first case of this kind which came up from Kentucky was that of Taylor and Bodley.]

If M'Donald ever had equity, he has forfeited it by his negligence. No step was taken to complete the title from 1774 to 1792, a period of eighteen years. 2 Wash. 106. Pickett v. Dowdall. 2 Wash. 121. Curry v. Burns. 1 Wash. 116. White v. Jones.

The doctrine of relation applies only to the parties themselves, viz. to M'Donald and the commonwealth of Virginia. It does not apply where the rights of third persons are concerned. Co. Litt. 190. Plowd. 188. 2 Vent. 200. 2 Wash. 113. 120, 121.

Rowan, in reply:

1. It was not necessary that the warrant should

have been in the hands of the surveyor. It was sufficient authority to him to survey the land if he knew that such a warrant existed. But if it were necessary that he should have had it in his hands, the presumption arising from his having made the survey is strong that he had the warrant, and is sufficient proof of that fact until the contrary be proved. The bill avers that the warrant was delivered to the surveyor. The answer does not deny it, and there is no evidence that it was not. It is a matter only between the complainants and the surveyor, and no other person can take advantage of it. It was no injury to the defendant.

2. The recording the survey within two months was a duty imposed by law upon the surveyor, and he was liable to a penalty if he neglected to do so; but his neglect could not invalidate the survey. It does not appear upon the record that the survey was not recorded within the two months. The presumption is, that the officer did his duty till the contrary appears. The act of 1748 requires the surveyor to return a list of his surveys to the college of William and Mary, who were entitled to certain fees upon every survey. It cannot be contended that the surveys were void if the list was not returned. There are a number of other things required of the surveyor by that act, yet it was never supposed that his neglect to do them would vacate his surveys. The recording was not intended as notice to others, because the surveyor was expressly forbidden by law to give a copy for twelve months. The only notice which the legislature intended should be given to subsequent purchasers during that period was the marking and bounding the land.

The survey is the appropriation. Sumner had all the notice which the legislature intended he should have. The depositions show that the land was actually marked and bounded; and that the marks and bounds were a matter of public notoriety.

The act of recording was a duty which the officer was bound to perform. The complainants could not compel him to perform it, and therefore they ought not to suffer if he neglected it. The issuing of the patent is strong evidence either that the survey was recorded in time, or that the want of such record did not invalidate the title. The register of the land-office was the person best acquainted with all the prerequisites to a grant. After a lapse of thirty years, all these prerequisites are to be preserved until the contrary appears.

3. It was not necessary that the plat and certificate should be made out by the same officer who made the survey. Every thing that is done by a deputy surveyor is supposed in law to be done by the principal, and when the principal himself undertakes to act, there can be no question. The principal is the only officer known to the law whose certificate can be respected. If the deputy acts, it is in the name of his principal. The making out of a plat and certificate from the field-book is a mere mechanical operation. It may as well be done by another as by the officer who actually ran the lines.

4. The complainants were not bound to file their caveat. The delay is no argument against their claim. It appears from the record that the patent was made to the heirs or devisees of M'Donald. His death, and their minority, account for the apparent delay.

5. As to the surplus. There never has been a survey vacated in Kentucky because it contained more land than the warrant required. If the lines had comprehended less, the party must have been the loser. If they comprehend more, it does not vacate the survey. The case of *Beckley* v. *Bryan, Sneed*, 107. is decisive as to that point.

6. As to the equity of the case. It is not necessary now to inquire how the courts in Kentucky first obtained a chancery jurisdiction in cases of this

TAYLOR
v.
BROWN.

kind. By a long course of practice, the question of interfering surveys, or entries, has been a question in equity. It is a mode of getting behind the patent. An elder patent is only considered as a means of protecting the prior equity. *Sneed*, 231. 233. 248. 267. 283. 331.

The survey of M'Donald was a prior appropriation of the land. It was no longer waste, vacant, or unappropriated land. It was not a subject for Sumner's warrant to operate upon. Lapse of time cannot enfeeble a claim. It either destroys it altogether, or it has no effect.

If the court would restrict M'Donald to his 2,000 acres, where shall they be laid off? The impossibility of locating them, so as to designate the surplus, is a sufficient reason for not adopting the principle.

### March 1.

MARSHALL, Ch. J. delivered the opinion of the court.

In this case the title of both parties originates in surveys made by the surveyor of Fincastle county, previous to the passage of the land law of Virginia. Both surveys were made on military warrants issued under the proclamation of 1763. The survey under which the plaintiffs claim, being prior in point of time, they have the first equitable title, and must prevail, unless the objections made to that survey be valid, or unless their equity is defeated by the circumstances of the case.

Several objections have been made to the survey, each of which will be considered.

1. It is said that the warrant was not in possession of the principal surveyor when the survey was made.

The answer given to this objection is conclusive. The warrant is an authority to, and an injunction on, the surveyor to lay off 2,000 acres of vacant land which had not been surveyed by order of council, and patented subsequent to the proclamation. Whether acts under this authority are valid or void, if the authority itself be not in possession of the officer, is perfectly unimportant in this case; because the court considers the certificate of the surveyor as sufficient evidence that the warrant was in his possession, if, in point of law, it was necessary that it should be lodged in the office. That certificate is in the usual form, and states the survey to have been made by virtue of the governor's warrant, and agreeably to his majesty's royal proclamation.

2. The second objection is, that the survey does not appear to have been recorded within two months after it was made.

The opinion, that this omission on the part of the surveyor avoids the title which accrued under the survey, is founded on the 6th section of an act passed in the year 1748, entitled, " An act directing the duty of surveyors of land." In prescribing this duty the law, among other things, enjoins the surveyor " to enter, or cause to be entered, in a book well bound, to be ordered and provided by the court of his county, a true, correct and fair copy and plat of every survey by him made during his continuance in office, within two months after making the same."

This section is merely directory to the surveyor. It does not make the validity of the survey dependent on its being recorded; nor does it give the proprietor any right to control the conduct of the surveyor in this respect. His title, where it can commence without an entry, begins with the survey; and it would be unreasonable to deprive him of that title by the subsequent neglect of an officer, not appointed by himself, in not performing an act which the law does not pronounce necessary to his title,

the performance of which he has not the means of
coercing.

If the omission to record the survey in two months
would avoid it, then the omission of any other act
enjoined by the same section would equally avoid it.
The surveyor is directed to see the land " plainly
bounded by natural bounds, or marked trees." Has
his conforming to this direction ever been inquired
into, in a contest respecting the validity of a sur-
vey? Would any gentleman of the bar contend that
the land was not plainly bounded, and that, for this
reason, a survey actually made was void? He is,
within five months, to deliver to his employer a plat
and certificate. Suppose six months should elapse
before he complies with this duty, is the survey
void? He is to certify the true quantity of land
contained in the survey. Would the gentlemen
from Kentucky be willing to adopt it as a principle
that every survey expressing a quantity more or less
than the true quantity is absolutely void? He is to
state the water-courses, and also the plantations next
adjoining. Should any one of these be omitted, is
the survey void? He is to return a list of surveys
in the month of June annually to the clerk's office.
Should he fail in this, are the surveys void? On
these points it is impossible seriously to insist ; and
the court can perceive no distinction between them.
They are all merely directory to the officer, and
none of them affect a title which commenced before
they are to be performed. He is subjected to a
penalty for failing in any one of these duties, but
his performing or omitting them is unimportant to
the rights of those for whom surveys have been
made.

3. The third objection is of more weight. It is,
that the survey must be certified by the person who
made it, and can be authenticated in no other man-
ner.

That, in point of fact, this survey was certified
as made, is not doubted. But it is said that the

plat and certificate want those appropriate forms which alone the law will receive as evidence of their verity.

The survey was made by Hancock Taylor, assistant surveyor of Fincastle county, from whose field-notes, the plat and certificate were made out by his principal, who also signed them. Hancock Taylor was prevented from performing this duty by a mortal wound received from the Indians. It is understood to be usual for the assistant, where surveys are actually made by him, to sign the plat and certificate, which are also signed by his principal.

The 46th section of the act, " for settling the titles and bounds of lands, and for preventing unlawful hunting and ranging," enacts, " that every survey of lands *intended to be patented* shall be made and returned by a sworn surveyor duly commissioned for that purpose."

Let us inquire whether, under this section, the plat and certificate must be made out by the person who made the survey, and whether a survey actually made by an assistant must be platted and certified by him.

It may be of some importance, in the construction of this section, to inquire whether the return alluded to is to the office of the principal surveyor, or to the land-office, out of which the patent is to issue.

In construing this section, the accompanying sections afford us no aid. But the general object of the act, and the allusion to *patenting* which is made in the section, would lead to the opinion that returns to the land-office were in contemplation of the legislature. If we examine the laws generally, we shall find that most usually the word " surveyor" is applied to the principal, and where the law alludes to the assistant, he is designated by the term " assistant surveyor." If the return directed by this section is to be made to the land-office, for the pur-

pose of obtaining a patent, then the principal surveyor is the person who is to certify it, and a survey actually run by himself, or by his assistant, is to be considered, in law, as a survey made by himself. It is believed to be most usual for the plat and certificate returned to the land-office, to be signed by the principal and by his assistant; but this section seems not to require both. The signature of the assistant is the justification to the principal for recording and certifying the survey, and is the best testimony that it has been made; but the law does not require, in terms, that where that best testimony is unattainable, no other shall be received. So far as the section which has been recited goes, the signature of the principal surveyor sufficiently authenticated this plat and that a patent has issued upon it, is proof that such was the opinion entertained in the land-office. A patent certainly does not issue of course, unless the papers on which it issues be regular. A plat not legally authenticated is no plat, and the register cannot justify issuing a patent on it.

This consideration certainly deserves some weight: but if the court inspect this section, it seems, in fair construction, to require only the signature of the principal surveyor, who, consequently, judges, in the first instance, of the testimony which will enable him to certify a survey. If the signature of the assistant can be dispensed with, then other testimony than his signature may authorize the principal to certify a survey; and if, in any possible case, other testimony can be deemed competent, it surely may in this.

If the return directed by this section be understood to be a return to the office of the principal surveyor, it is necessary to inquire what it is that the section exacts. It is, that the " survey shall be made and returned by a sworn surveyor," not that the plat shall be made out and certified to the principal by the assistant who run the lines. The courses and distances contained in the field-book of the assistant, represent to the principal as correctly

and as intelligibly the survey actually made, as the plat and certificate could do.   From these data he is as capable of placing on his record-book a correct plat, and of returning that plat to the land-office, as if the lines of the survey had been placed on paper by the assistant himself.  It would seem reasonable, therefore, even on this construction of the section, in the actual case where death has disabled the assistant from platting his works, to consider the law as satisfied by the delivery of those works to the principal surveyor.

The "act directing the duty of surveyors of land" does not appear to this court to contain any provisions which are opposed to the construction here made of the preceding act of the same session.   The 6th section of that act, which has been particularly referred to by counsel, prescribes the duty of surveyors, but contains no direction respecting the signature of plats and certificates, except this: "Every surveyor making a survey of land shall see the same plainly bounded by natural bounds, or marked trees, and within five months after survey, shall deliver to his employer a plat and certificate thereof."

It has never been understood that this plat and certificate may not be delivered by the principal; and other parts of this section show that the duties enjoined, are some of them to be performed by the principal.   The section proceeds to say, "and shall also enter, or cause to be entered, in a book well bound, to be provided by the court of *his* county, a true, correct and fair copy and plat of every survey by *him* made."   Now this book is the book of the principal.   It is, of course, his duty to superintend the entries in it.   They are to be " of the surveys by *him* made." The survey made by the assistant, is, then, to be entered by the principal as a survey by *him* made.   He is also to return annually a list of the surveys by *him* made, to the county court clerk's office.   This return is made by the principal.   Certainly the list must include all the surveys made by

6

his assistants. They also are considered as made by him. Upon a view of the whole section, the court perceives nothing in it which renders it improper for the principal to plat and certify a survey made by his assistant whose field-notes are returned complete to him, and who has been disabled by death from making the plat himself.

This construction is very much strengthened by the terms of the act of 1779. That act declares "that all surveys of waste and unappropriated land made upon any of the western waters before the 1st day of January, 1778," " by any *county surveyor,* commissioned by the masters of William and Mary college, acting in conformity to the laws and rules of government then in force, and founded either upon charter," &c. " or upon any warrant from the governor for the time being, for military service, in virtue of a proclamation either from the king of Great Britain, or any former governor of Virginia, shall be and are hereby declared good and valid; but that all surveys of waste and unpatented lands made *by any other person,* or upon any other pretence whatsoever, shall be and are hereby declared null and void."

Notwithstanding this declaration, we find that patents have actually issued, under which both parties in this cause claim, on surveys made not by the county surveyor in person, but by his assistant. It is perfectly well known that a great proportion of the surveys recognised by this act have been really executed by assistant surveyors. Upon what principle of construction are they brought within the act? Clearly upon this. The law, so far as respects the validity of the survey, considers the act of the deputy as the act of his principal. A survey made by an assistant is, in law language, made by the principal. And if this idea be taken up on so material a clause as that which confirms or invalidates every survey previously made, and which is expressed in terms much more explicit and decisive than any of the clauses in the preceding acts, must

not the idea be carried throughout? Must not the survey, in all cases, be considered in a legal point of view as made by the principal through the agency of his deputy, and must not this principal be kept in view in construing the laws upon the subject.

This survey, then, is, in law language, made by William Preston. It is confirmed as a survey made by him. The law recognises it as his survey. Assuredly, then, his certificate may authenticate it.

The act proceeds to say that " all and every person or persons, his, her or their heirs, claiming lands upon any of the before recited rights, and under surveys made as herein before mentioned, (that is, by a county surveyor,) against which no caveat shall have been legally entered, shall, upon the plats and certificates of such surveys being returned into the land-office, together with the rights, &c. upon which they were respectively founded, be entitled to a grant for the same."

To the court, it seems clear that the law authorizes a plat and certificate of survey from the person whom it contemplates as the maker of that survey; that is, from the county surveyor. The formal requisites of the law are complied with by a plat and certificate under his signature. He has given it, in this case, on testimony, which the court deems as full and complete as even the plat certified by the assistant who made the survey would have been.

These are the objections which have been made to the survey under which the plaintiffs claim. After bestowing on them the utmost attention, the court is decidedly of opinion, that the survey of M'Donald was and ought to be considered as a good and valid survey.

4. The 4th objection to the plaintiffs' claim is founded on their negligence.

At law, this objection is clearly of no validity. The proviso to that section of the act of 1779, which has been considered, declares that such surveys shall be returned to the land-office within twelve months after the expiration of that session of assembly, or should become void. The time for returning them, however, was prolonged until this patent issued. Consequently, a *caveat* to prevent the emanation of the patent, because the survey was not returned in time, could not have been maintained. If the survey of M'Donald came within the law, the circumstance, that the subsequent survey of Sumner was made without notice in fact, cannot alter the case. His warrant only authorized him to acquire vacant-land, and he took upon himself to find lands of that description. The principle, *caveat emptor*, is directly applicable.

5. The 5th objection made by the defendant is, that the patent of the plaintiffs contains surplus land. The warrant, it is said, was an authority to survey only 2,000 acres, and, for the surplus, the survey was made without authority.

It is a fact of universal notoriety in Virginia not only that the old military surveys, but that the old patents of that country generally contain a greater quantity of land than the patents call for. The ancient law of Virginia notices this fact, and provides for the case. It prescribes the manner in which this surplus may be acquired by other persons; and it is worthy of notice that the patentee must himself reject the surplus before it can be acquired by another, and, after having so rejected it, he has the election to allot it in such part of his patent as he pleases.

It is contended, however, that although a grant containing surplus land might give a legal right to such surplus, yet a survey could not be carried into grant so far as such surplus appeared upon a *caveat*.

Vol. V.

On this subject we find no act of Virginia under the regal government. At that time the governor and council constituted a branch of the legislature and the general court of the colony. They also held a distinct court in the council chamber for the trial of *caveats*, their decisions on which were regulated by rules established by themselves. These rules, it is believed, are lost; and it is also believed that the means of ascertaining satisfactorily what they were, are no longer attainable. The land law of 1779 was framed by men who understood them, and it is not unreasonable to suppose that, in drawing that law, some respect was paid to them. That law, gives a *caveat* against a survey not returned to the land-office within twelve months after it is made, or whose breadth shall not be one third of its length, but gives no *caveat* on account of surplus land contained in a survey, nor does it indicate the idea that, on a survey containing such surplus, a *caveat* could not be supported. If such survey is not absolutely void for the whole, the difficulty of assigning the exact quantity is sufficient to have induced legislative regulation, had it been contemplated as the subject of a *caveat*. It would seem that, for security in this respect, the government trusted to the oaths prescribed for surveyors and chain carriers. It is also worthy of remark, that the law of 1779 superadds to the restrictions formerly imposed on taking up surplus lands contained in any patent, that it can only be done during the life of the original patentee, and before any alienation has been made.

It is also to be observed, that the act of 1779 confirms this survey, and it is understood that no previous entry was deemed necessary to its validity. The entries made on treasury warrants are most frequently in such terms that a survey for a greater quantity of land might be considered as being so far contrary to location, and might be restrained by the location; but, where there is no entry, the difficulty of restraining the survey is much increased, because there exists no standard by which to reduce it. There is, indeed, a standard as to quantity, but

not as to form and place. The survey is an appro-
priation of a certain quantity of land by metes and
bounds, plainly marked by an officer appointed by
the government for that purpose, and it would seem
that the government receives his plat and certificate
as full evidence of the correctness of the survey.
This being the case, it is admitted by the govern-
ment to be an appropriation of the land it covers,
and it is difficult to discern a rule by which the sur-
vey could be reduced on a *caveat* by the owner of
an interfering survey, unless the entry on which it
was made was in such terms that the excess might
be considered as surveyed contrary to location.
For to every and to each part of the land surveyed,
its owner has an equal right.

Whatever rules might have been established in
the tribunal having jurisdiction of the subject, un-
der the regal government, the *caveat* in this cause,
had one been entered, must have been regulated by
the act of 1779. That act gives validity to both
surveys; and although it directs *caveats* depending
in the council chamber, at the commencement of the
revolution, to be transferred to the general court,
and to be tried by the rules which governed when
they were entered, it subjects future *caveats* to the
law then introduced. Under this law, as has al-
ready been stated, the court can perceive but one
principle on which a survey can be reduced on a
*caveat*, and that principle is inapplicable to this case.

In conformity with this opinion is that of the
judges of Kentucky. Not a case exists, so far as
the court is informed, in which, on a *caveat*, the
quantity of land in the survey of plaintiff or defend-
ant has been considered as affecting the title, upon
the single principle of surplus. Yet the fact must
have often occurred. And in the case of Beckly *v.*
Bryan and Ransdale, the contrary principle is ex-
pressly laid down. In that cause the court said,
" It is proper to premise that there is but one spe-
cies of cases in which any court of justice is autho-
rized by our land law to devest the owner of a sur-

vey of the surplus included within its boundaries; namely, where the survey was made posterior to an entry made by another person on the same land; and to do more would be unequal, and unjust, inasmuch as a survey which is too small cannot be enlarged.

This position, it is true, was laid down in a contest between a military survey and a patent on a treasury warrant. But it is laid down in terms equally applicable to a contest between two military surveys; and the court does not understand that the law has ever been otherwise understood in Kentucky.

The opinions delivered by the judges of appeals of Virginia in the case of *Johnson* v. *Buffington*, 2 *Wash.* 116. would incline this court very much to the opinion that the same rule prevailed in the council chamber before the revolution. In that case, under a warrant from Lord Fairfax for 300 acres of land, 450 acres had been surveyed, and the excess appeared on the plat. This survey had lain in the office many years, and was clearly forfeitable; but Lord Fairfax had not taken advantage of the forfeiture. After his death a patent issued on a subsequent entry and survey, and the patentee was decreed to convey to the person claiming under the prior entry. In delivering his opinion Judge Fleming said, "The first objection made by the counsel for the appellant is, that the survey does not pursue the warrant; but I think there is no weight in this, as the variance is only in the quantity. If the land had been *imperfectly* described, it might have been fatal."

Judge Carrington said, "He did not consider the variance between the warrant and survey, as to the quantity, as being of any consequence."

The President, who had been an eminent practitioner in the council chamber, said, "He felt no

difficulty about the variance in the quantity of the land."

The rules established by Lord Fairfax were known to conform to those of the crown, and the declarations of the judges in this case, all of whom were acquainted, in some degree, with the usages under the regal government, make a strong impression on this court in favour of the opinion that, in the council chamber, the law was understood to be, that excess in the survey was not to be regarded.

The law of this case, then, so far as respects the state of title previous to the emanation of either grant, appears to be with the first survey. It remains to inquire whether a court of equity will relieve against the legal title acquired by the first grant.

The principle on which relief is granted is, that the patent, which is the consummation of title, does, in equity, relate to the inception of title; and, therefore, in a court of equity, the person who has first appropriated the land in contest has the best title, unless his equity is impaired by the circumstances of the case.

In this cause, the first patentee is said to be a purchaser without notice. But, for the reasons assigned in a former part of this opinion, the court does not consider him as clothed with that character. His warrant authorizes him to survey waste and unappropriated lands, and he undertakes himself to find lands of that description. The government acts entirely on his information; and the terms of his grant are, that the lands were waste and unappropriated. It is not for him to say that he had misinformed the government, and had surveyed appropriated instead of vacant lands, and had thereby entitled himself to be considered as a purchaser without notice.

Neither does the court conceive that the plaintiffs

TAYLOR
v.
BROWN.

have forfeited their right to come into a court or
equity, by their negligence.

In the case of 1 *Wash.* 116. the prior right of
the plaintiff had been absolutely forfeited, so that the
defendant had the first title both in equity and
law, and the plaintiff's bill was dismissed because
he failed to prove the fraud which he alleged, and
which was, in that case, necessary to give the court
jurisdiction.

In the case of Picket and Dowdale, and of Currie
and Burns, there were both forfeiture and abandon-
ment.

In the case of *Johnson and Bronw*, 3 *Call,* 259.
more than sufficient time had elapsed between the
entry and survey of the plaintiff to produce a for-
feiture; but, by the old law, notice was to be given
by the surveyor before a forfeiture could take place,
and this fact was not proved. During forty years
this entry had been totally neglected; and the court
was of opinion that, after such a lapse of time,
the fact of notice by the surveyor might be pre-
sumed. This case then also turned on the principle of
forfeiture. There were, besides, a great many cir-
cumstances in Johnson's title which gave a strong
bias to the judgment of the court.

The difference between the case under consi-
deration, and those cited is apparent. But the case
of Johnson *v.* Buffington was much stronger than
this. The prior survey was actually forfeitable, but
had not been forfeited; and in that case, after a
much longer time than exists in the present, a court
of equity supported it against the eldest grant.

The general principles which have been relied on,
in this branch of the argument, cannot be considered
as applicable to a case in which the act, which con-
stitutes the foundation of the charge of negligence,
was performed within the time allowed by statute

for its performance. The circumstances, which ex-
cused the owners of military surveys for not return-
ing them, were before the legislature and have been
declared, by law, to be sufficient.

But it is contended that the plaintiffs can have no
equity beyond the 2,000 acres contained in the war-
rant on which M'Donald's survey was made.

If this court is to consider itself as merely sub-
stituted for a court of law, with no other difference
than the power of going beyond the patent, this
question is already decided. But, in the case of
*Bodley and Hughes* v. *Taylor*, an opinion was in-
dicated that its jurisdiction, not being given by
statute, but assumed by itself, must be exercised
upon the known principles of equity. This opinion
is still thought perfectly correct in itself. Its appli-
cation to particular cases, and indeed its being con-
sidered as a rule of decision on Kentucky titles, will
depend very much on the decisions of that country.
For, in questions respecting title to real estate espe-
cially, the same rule ought certainly to prevail in
both courts.

But, in its equity, this case differs essentially
from Bodley and Hughes v. Taylor. In that case,
Taylor had the eldest entry as well as the eldest
patent. In this, the eldest equitable right is with
him who holds the eldest* grant. In that case, the
variance between the entry and survey of the elder
right is established by a set of rules growing out of
expositions subsequent to the survey. In this, the
eldest grant is founded on a survey made on land
which, in point of fact, was previously appropriated.
But, which is of great importance, in that case, the
terms of the subsequent location prove that the loca-
tor considered himself as comprehending Taylor's
previous entry within his location, and, consequent-
ly, did not suppose so much of the land covered by
his entry as being then subject to appropriation.

* *Quære, youngest?*

He either did not mean to acquire the land within Taylor's entry, or he is to be considered as a man watching for the accidental mistakes of others, and preparing to take advantage of them. What is gained at law by a person of this description, equity will not take from him ; but it does not follow that equity will aid his views, and give more than the law gives him, by allowing him to hold what he has legally gained, while he demands what is legally lost.

In this case, M'Donald supposed himself to be appropriating, and in fact was appropriating, land to which no other had, at the time, any pretensions.

In addition to these strong differences, in equity, between the two cases, no decision of Kentucky was shown to the court, which was applicable to the case of Bodley and Hughes v. Taylor. But the case of Beckly v. Bryan and Ransdale is conceived to be an authority in point for this case. The decision of the court of appeals of Virginia, in the case of Buffington and Johnson is also considered as expressly in point, and is to be respected, because both these surveys were made while the country in which they were made formed a part of Virginia.

It is thought not absolutely unimportant, in a court of equity, that one of the circumstances has occurred, which, at law, rescues the surplus land in M'Donald's patent from the possibility of being acquired by any other person. An alienation has taken place. The decree, therefore, of the court for the district of Kentucky, is to be reversed, and the defendant must be decreed to release to the plaintiffs, respectively, the lands within Sumner's patent which lie within the lines of the land conveyed by M'Donald's heirs to them respectively.