^Opinion of the court, by
Judge Burnet:
The complainant claims under an entry in .the name of Bobert Means, made May 23,1808, in the following words: Bobert Means, assiguee, enters two thousand six hundred and sixty-six and two-thirds acres of land, on military warrant No. 5,387, on the waters of Deer creek, beginning at three elms, southeasterly corner to Baron Steuben’s survey, No. 2,698, running north thirty, east two hundred and ninety-six poles, etc. On the margin of this entry is the following memorandum: fifteen hundred acres withdrawn from the northeast end (entered 147).
This entry was surveyed June 14, 1809, recorded August 12,. *389 1811. Patent obtained October 7, 1812, in the name of complainant, assignee, etc.
Steuben’s survey, No. 2,698, was made June 30, 1796, and in the following words: Surveyed for Major General Steuben eleven hundred and fifty acres of land, on part of military warrant No. 104, on the northwest of the Ohio, and on Deer creek, a branch of the Scioto, beginning at an ash, a white oak, and a maple, northeast corner to James Innis’ survey, No. 1,727, running with Innis’ line, south twenty, west four hundred poles, crossing Deer creek, at one hundred and eight poles to a stake, southeast corner to Innis’, thence south twenty-one, east three hundred and seventy-four poles to three small , thence north sixty-nine, east three hundred and twenty poles, crossing the creek at sixteen poles, to three elms, thence north eighteen, west six hundred and seventy poles to a stake, thence south sixty-nine, west eighty-four poles to the beginning.
The survey of James Innis was made on the same day (June 30, 1796), and calls for Deer creek.
The defendants, Doolittle and Thomas, claim under an entry in the name of Thomas Chilton, made on April 27, 1807, in the words following: Thomas Chilton, heir at law to John Chilton, deceased, enters five hundred and forty-one acres of land, on part of military warrant No. 1,249, on the waters of Deer creek, a branch of the Scioto river, on a branch emptying in on the upper side, by some called Opossum, and by others called Plum run, beginning, by survey made, at three elms and a *large white oak, running south nineteen, west twenty poles, south sixty, west forty poles, to three pin oaks, marked as a corner, north thirty, west one hundred and sixty poles, north sixty, east forty-four poles, north two hundred and ten, east two hundred and sixty, south thirty, east sixty-two, south fifty-seven, east one hundred and twenty, south forty-five, west one hundred and forty-five, thence, and from the beginning, south seventy, west for quantity. This entry was surveyed August 30, 1810, and a patent was granted to Doolittle, July 27, 1812.
The defendants, Dunlap, McHenry, Phcebus, and Senate, claim, ■under an entry in the name of John Stokes, made November 8, 1807, in the following words: John Stokes enters four hundred acres of land on part of warrant No. 1,390, on Opossum or Plum ¿run, a branch of Deer creek, beginning on the run, where the *390 lower line of Thomas Chilton’s entry crosses the same, running down the run, with the meanders thereof, four hundred and eighty-poles, when reduced to a straight line, thence, and from the beginning, at right angles to the general course of the run, on each side, to include an equal quantity on each side, by parallel lines, to the general course thereof. This entry was surveyed December 10, 1811, recorded January 1, 1812, and patented April 8, 1812.
As the defendants have the first entries, and are in possession' under the oldest patents, they may protect' themselves by showing the sufficiency and legality of their own locations, or the insufficiency and illegality of the location, under which the complainant holds. If they have succeeded in establishing either of these propositions, or if the complainant has failed in sustaining the validity of Means’ entry, he is not entitled to a decree. But before I proceed to examine the evidence which has a direct bearing on those points, it will be proper to notice some collateral questions, which have been discussed by counsel in the course of the argument.
1. It is alleged, on the part of the defendants, that there is no proof of the entries and surveys mentioned in the pleadings, or that Steuben’s survey is numbered 2,698.
This objection does not appear to be true in point of fact, and probably would not have been taken, if the connection of-entries and surveys, from the records in Col. Anderson’s office, had been carefully inspected. In the voluminous file *of papers appertaining to the cause, this document must have been overlooked, because it contains certified copies of all the entries and surveys referred to in the pleadings, and was received as evidence without objection. It does not appear on what ground this exception was taken. If it be predicated on a supposed defect, or informality in the mode of authentication, the objection comes too late. The document was received as evidence — the defendant took no exception to it at the time — the complainant has relied on it, and it. would be a mischievous precedent to permit an objection to be-, taken at this stage of the proceedings.
2. It is urged that Steuben’s entry and survey depend on Innis’' entry and survey, the situation of which is not shown.
This objection would have some weight, if the complainant could be required to show that Steuben’s entry was precise and. certain, at the time it was made. This, however, is not the case. *391 It is immaterial to him, whether that location can be sustained or not, because a survey of a void entry may be a good special call in a subsequent entry, if the survey called for has obtained general notoriety before the entry calling for it is made. This being the settled principle, the complainant is not required to show the situation of Innis’ entry nor survey. He may safely admit that Innis has neither entry nor survey, and that Steuben’s entry had neither certainty nor precision, at the time it was made. The reason why Steuben’s survey is a good call, if it shall be found to be such, is, that it had become an object of notoriety, and on that account, might be readily found by a subsequent locator; and that when found, it would, by reasonable attention, lead an inquirer to the beginning of the entey calling for it. A burning spring, if generally known, would be a good call, not because it had become a valid landmark to a former location, but because it would enable a subsequent locator to find the entry calling for it. On the same principle, if Steuben’s survey, at the date of Means’ entry, had become an object of general notoriety, it was a good call on that account, whether the entry of Steuben was a valid appropriation of the land or not. Steuben may have lost his land for want of precision and certainty *in his call, and yet Means, by calling for Steuben’s survey, may secure his land, on the ground that his call was sufficiently certain, precise, and notorious to identify the land intended to be appropriated, and to enable subsequent locators easily to find it.
3. The next objection is, that the complainant has not shown his right to the entry of E. Means.
To this it may be replied : 1. That the assignment of the entry to the complainant is averred in the bill, and impliedly admitted in some of the answers, if not in all. 2. That a patent having regularly issued to the complainant, as assignee of E. Means, is prima fade evidence that the assignment was legally made, and must be considered as conclusive on that point, until the contrary is proved, at least as to third persons, who have no pretense of claim under the assignor, nor any interest in vindicating his rights. The complainant must have produced an assignment of the plat and certificate, or the patent could not have issued in his name. If that assignment was improperly obtained, the original proprietor, or those claiming under him, are at liberty to impeach it. But if this objection be entitled to any weight, it applies with *392 equal force to the defendants. Doolittle and Thomas claim by assignment from Thomas Chilton, who is said to be heir at law to John Chilton, the original owner of the warrant. But no evidence, other than the recital of the patent, is produced to show, either the heirship of Thomas Chilton, or the transfer from him to the defendants. Strictly speaking, this is a question between the complainant and Means, in which the defendants have no concern.
4. It is alleged that complainant had personal notice of the defendants’ entries before he made the entry in the name of Means. The evidence on this subject is that he had notice of those entries in 1809, about the time he surveyed for Means, which was more than a year after the entry. His notice, however, may safely be admitted, to the extent claimed.
It was decided by this court, in Kerr v. Mack, 1 Ohio, 161, that the common doctrine of notice does not apply to cases under the land laws of Virginia, when the parties *claim under distinct entries. Every claimant must rest on the validity of his own location. If that be illegal and void, it does not appropriate the land; and any holder of a warrant may locate the same tract, notwithstanding he has full knowledge of the former illegal entry. Notice can not make that valid, which is void in itself; nor can a legal location be rendered void by a notice, that a prior illegal entry had been made on the same land., This doctrine will be found also in Craig v. Pelham, Printed Decisions, 287; Wilson v. Mason, 1 Cranch, 100.
5. It is urged that these defendants are innocent purchasers, without notice.
The same plea might be advanced in favor of every person who may be so unfortunate as to purchase a bad title ; but ignorance, or want of care, can not destroy the rights of others.
If the contending parties in this suit had purchased from the same individual, and the defendants, under the junior contract, had obtained the legal title for a valuable consideration, and without notice of the elder contract, they would have been protected, but such is not their situation. They have purchased the title of Chilton and Stokes — the complainant has purchased the title of Means; and the only inquiry is, which is the better title. If they have been so unfortunate as tp purchase from a person without title, a knowledge of that fact can not prevent others from pur* *393 chasing from the real owner. This objection is fairly met by the maxim, caveat emptor. In Taylor v. Brown, 5 Cranch, 235, it' was decided that a subsequent locator, without notice of a prior location, can not protect himself by obtaining the elder patent.
6. The next objection is, that in May, 1808, Chilton’s entry had become as notorious as Means’ — that the equity of the parties was, therefore, equal, and that the law must prevail.
It was decided by this court, in Kerr v. Mack, in conformity with the current of decisions in Kentucky, and in the Supreme Court of the United States, that an entry can not be aided by “ after-acquired notoriety.” In the face of that decision, the court did not expect to have the question agitated. It is evident that without the aid of *that description of notoriety, the doctrine of equal equities can have no place in this discussion. The entry of Chilton must be considered as it was on the day it was made; consequently, if it has any equity, it must be older and superior to that of the complainant. The equities can not be equal.
7. It is said that a call to adjoin an entry, requires that all the locative calls of that entry be shown, for which 3 Bibb, 536, is cited. The principle, however, has no application to the complainant, who calls for Steuben’s survey, and not for his entry, but it applies in all its force to the defendants, who claim under •Stokes, whose entry calls for, and depends wholly on the entry of Chilton. It can not be useful, therefore,, to pursue this part of the subject further, unless it shall be found necessary to do so hereafter, in considering and deciding on the validity of Stokes’ entry.
8. Another objection is that the original entry of Means was ■void, because its length compared with its breadth exceeded the proportion allowed by statute.
If this objection has not been obviated by the amendment of ■the entry, made by the withdrawal of the fifteen hundred acres, it would seem to be fatal to the complainant’s claim. The statutes under which these warrants were located (Swan’s Collection of Land Laws, 122), i*equires the breadth of each survey to be at least one-third of its length in every part, unless when such breadth shall be restrained on both sides by mountains, watercourses, or former locations. The calls of the entry show that this proportion has not been observed and it is not pretended that the obstacles provided for exist. The question then is, has the withdrawal of the fifteen hundred acres removed this difficulty. This *394 question admits of but one answer. If the withdrawal has not destroyed the validity of the entry, as the defendants’ counsel contend, it has obviated the difficulty, because the survey that has been made on the residue of the entry, and on which the patent issued, is clearly conformable to the requirements of the statute in this respect.
The question then presents itself, has the withdrawal vitiated the original entry? There is no doubt but that ^locators have a right to amend their entries, or to withdraw them in whole or in part. The rule on this subject seems to be, that the withdrawal of part of an entry will not destroy the validity of that entry as to the residue, provided it be so made as to leave the residue possessed of the certainty and precision required to constitute a good original entry. Sprigg v. Ogden, Marsh. 612. In Preeble v. Vanhousen, 2 Bibb, 121, it is laid down that after a withdrawal the remaining part of the entry should be considered as having the calls of the original entry, and if, with those calls, it would be good as an original location it ought to be sustained. Tested by this rule the withdrawal does not injure the entry, because the calls of the original entry being saved, the residue is certain both as to quantity and situation, and can be ascertained with the same ease and precision as the entire entry could have been ascertained before the withdrawal; hence it follows that if the first entry was good as to its calls, the residue, as an entry, is also good. There is no weight in the argument drawn from the fact that the withdrawal throws the complainant entirely from Steuben’s southeast corner, and consequently from his own beginning corner, because having a right to refer to the corner as one of the locative calls of his entry, it affords the means of ascertaining and fixing his beginning with absolute certainty. “ That is certain which can be rendered certain.” The amount of the argument is, that a withdrawal'can not be made of that part of an entry which includes its beginning, because it must always throw the location at a distance from its original beginning; but we think there is nothing in the objection. The beginning of the first entry may,, by a withdrawal, be converted into a call, pointing out the beginning of the residue of that entry.
On the part of the complainant, it is insisted that the certainty and notoriety of Means’ entry have not been put in issue, and that proof should not be required to establish them, nor admitted to *395 controvert them. It is true that the bill avers the entry of Means-to be good, certain, legal, and valid when made, and the answers neither admit nor expressly deny the averment, though some of the defendants state their ignorance of the facts relating to Means’ entry.
*The complainant attempts to sustain this ground on the case of James v. McKennon, 6 Johns. 543. The rule settled in that case is one which has been generally observed in this court, viz : That evidence oug.ht not to be received of a matter not put in issue. But the important question arising here is, when shall a matter be said to be in issue? The complainant has taken it for granted that the sufficiency of his entry is not in issue, but the authority on which he relies does not sustain him. In that case the bill alleged that defendants had possessed themselves of property to which complainants were entitled, and prayed that it might be decreed to them. One of the defendants in his answer sot up a contract, under which he claimed a right to the property. The replication was general. The defendant proved the contract; the complainant offered evidence to impeach it on the ground of fraud. It was decided that he could not do so, because he had not alleged fraud in his bill or replication, and therefore the fact of fraud was not in issue. Here, it will be remarked, that the contract was not-noticed either in bill or replication.
It was averred in the answer, and that averment was considered as putting it in issue. The silence of the complainant was not taken as an admission, but proof was required. The evidence of fraud was rejected because it was nowhere alleged in the pleadings. But from the course of reasoning it is evident, if an averment of fraud as to the contract had been found in any part of the pleadings, the evidence would not have been rejected. It has been the-constant practice of this coux*t to consider any fact that is distinctly averred in the pleadings, if it be relevant to the matter in controversy, as being in issue, and susceptible of proof. If any material averment in the bill be not answered by the defendant, the complainant has his election to except and require a further-answer, or to proceed and take on himself the risk of sustaining the matter by testimony, and this is sometimes the wiser course, as requiring less evidence than is necessary after the defendant is-driven to a denial. It has been decided in the court of appeals of Kentucky, that if a bill charges the matter to he within the knowl *396 edge of the defendant, and the answer is silent as to the matter so charged, it *will be taken to be admitted, but if not so charged, an omission to answer does not admit it. Moore v. Docket, 2 Bibb, 69; Kennedy v. Meredith, 3 Bibb, 465; Cowan v. Price, 1 Bibb, 173. It was decided in Oldham v. Bowen, 3 Bibb, 539, that a fact charged in a bill and not admitted by the answer, either expressly or by implication, must be proved at the hearing. And in Young v. Grundy, 6 Cranch, 51, it was decided that allegations in a bill, neither admitted nor denied by the answer, must be proved at the hearing. Our practice is in conformity with this rule, and requires the averment, in relation to the sufficiency of Means’ entry, to be sustained by proof, though the answers are silent on that point, nor does this requirement interfere with the rule relied on by the complainant, that the allegata et probata must agree.
Having disposed of these questions, we are next to examine and consider the locations on which the parties severally rely.
The defendants being in possession under the oldest grant, the •complainant can not disturb them without showing in himself the commencement of a good title anterior to their surveys. To effect this three points are to be made out:
1. That Means’ survey was precise and certain at its date.
2. That the entries' of Chilton and Stokes were uncertain and insufficient.
3. That Means’ entry was made before the entries of Chilton .and Stokes were surveyed.
The calls of Means’ entry are for Deer creek and the southeasterly corner of Baron Steuben’s survey, number two thousand six hundred and ninety-eight. It is admitted that Deer creek was generally known in May, 1808, and was therefore a good general call, and it seems to be conceded that Steuben’s entry did not possess the certainty and precision necessary to constitute a valid loca-' tion at the time it was made. It is sufficient, however, for the complainant’s purpose, if he has succeeded in showing that the survey of Steuben had acquired general notoriety on May 23, 1808, when the entry of Means was made. To ascertain this point, it is necessary to examine the testimony. *1. It appears that the survey of Steuben had been made about twelve years before the entry of Means. That Churchill Jones had called for it in his .survey, and that Jones’ survey was improved and settled by at least three persons before and at the time when the entry of Means *397 was made. These circumstances afford a presumption in favor of' the notoriety of that survey. In addition to this, its notoriety is proved by a number of witnesses, six of them being experienced surveyors, prior to the date of Means’ entry.
Isaac Minor settled in the neighborhood in February, 1802; shortly after, he was informed of Steuben’s survey (2,698). It appeared notorious. Many persons were residing in the neighborhood. The adjoining survey had been cut up into small farms, and settled before the date of Means’ entry. He believes that an inquirer on Deer creek would have been directed to Steuben’s survey. Bell’s survey, and Baylor’s survey, immediately below, on the creek, were also settled and improved before the entry of Means was made.
Henry Ward was on Steuben’s survey in 1802, in 1804, and in January, 1807. He states the names of about fifteen persons who were settled in the immediate vicinity of Steuben’s survey, in 1807. That it was known to the settlers generally, and was notorious as early as the spring of 1807. He had been, at different times, with the surveying parties of Evans, Rector, Langham, Massie, and O’Bannon, to all of whom Steuben’s survey was known.
John Harrison first went on to Deercreek in 1806, and settled-in the neighborhood of Steuben’s survey. He gives the names of about twenty persons settled in the vicinity of that survey, before the date of Means’ entry. He thinks it would have been found by an inquirer as early as May, 1808.
Patrick McLain knew Steuben’s survey as early as M¿iy, 1808.
John Fallon knew the survey in 1807. Thinks a locator, by proper diligence, would have found it at that time. That it was notorious, and generally known to surveyors, locators, and others, as early as 1807, at which time, many persons were residing near it.
*Jesse Spencer was acquainted with Steuben’s survey in 1800. He thinks that a locator, in 1807, with proper diligence, could have found it. He believes that survey was notorious, and' generally known to surveyors, locators, and others as early as 1807.
John Evans was acquainted with Steuben’s survey in 1807. The southeast corner was then standing. He believes that any locator, by proper diligence, could have found it in 1807. In January,. 1808, he thinks it was generally known to the inhabitants of the-neighborhood. In January, 1807, he could have found it without difficulty.
*398 Jeremiah Minor removed to the neighborhood of Steuben’s .survey in 1808. Heard it then spoken of by the neighbors as generally known. Thinks anybody could have found it; and that it was as well known in the neighborhood as the creek itself.
John Eckford knew the survey of Steuben in 1807; heard Uangham and other persons speak of it as early as that time.
E. Langham has known Steuben’s survey since 1801. It was then so notorious that he found it very easily from the information of others. The beginning corner was notorious to himself, and the locators and surveyors, as early as 1807.
N. Massie knew the chain of old surveys on Deer creek, including Steuben’s, long before 1807. He thinks any locator, with that connection and reasonable diligence, could have found Steuben’s survey before 1807.
James Gallaway, Jr., thinks there would have been no difficulty in finding Steuben’s survey in 1807. He had occasion to search for it in June, 1809, when he found it without difficulty.
F. Graham, W. Wilson, and J. Freeman identify the survey, .and the elm on the southeast corner called for by Means.
The defendants have introduced a number of witnesses, who testify that Steuben’s survey was not known to them at periods subsequent to the location of Means. We admit the principle, that negative testimony is entitled to its full weight on questions ■of notoriety, for reasons which it is not necessary now to detail, provided the opposing witnesses have equal advantages of information ; but we are decidedly *of the opinion that the negative testimony in this case can not preponderate. The wit.nesses by whom it was proven have not had the same opportunities of acquiring information on the subject as those who testified in the affirmative. Several of them have a direct interest in the .suit. Some of them resided in a more remote settlement. A portion of them appear to be industrious, domestic men, who have paid little, if any, attention to entries or surveys. Some have recently moved to the settlement; others never heard of Steuben’s survey till the commencement of the present suit; though it is admitted by all that if that survey was not notorious before, it became so shortly after the location of Means. The affirmative witnesses, generally, are the most intelligent, and those of them ■who live in the neighborhood reside nearer to the survey, and *399 more immediately on the creek, and would be most likely to be called on for information by subsequent locators.
It is not necessary to consume time, by commenting particularly on the complainant’s testimony, which is very full and precise. We are, on the whole, perfectly satisfied, that the notoriety of Stuoben’s survey, at the date of Means’ entry, is sufficiently established.
Chilton’s entry calls to begin at throe elms, and a large white oak, on the waters of Deer creek, on a branch emptying in on the upper side, by some called Opossum run, and by others, Plum run. Stokes’ entry calls for Opossum run, and the lower line of Chilton’s entry.
Testimony was introduced for the purpose of proving that Opossum run was notorious, when Chilton’s survey was made, and that Chilton’s location had acquired general notoriety before Stokes’ entry was made, but it is very apparent that the testimony does not establish either point. Langham, who made these entries, says that they were made before there was any settlement on the run, and that the run became notorious after the settlements were made; of course it was notorious when the entries were made. But if the defendants had succeeded in proving the notoriety of that run, it would not sustain the entry. The creek, it appears, was two miles in length, and the valley through which it runs about two miles in width. A subsequent locator *was, therefore, subjected to the necessity of searching the whole extent of that valley, to find the marked trees called for. This,we think, was unreasonable, and imposed a duty that the law does not authorize. The entry of Chilton is destitute of the precision and certainty which is required to constitute a valid location. The witnesses who were examined to sustain both of these entries, refer to periods subsequent to their date, and in addition to this, they state, that the entry claimed by Chilton, was known by the name of Langham’s entry, or that the two together were known as Langham’s and Doolittle’s eight hundred acre tract. They never heard them spoken of as the entries of Chilton and Stokes, until after the date of Means’ entry. When Stokes entered, Chilton’s entry, if it had any notoriety, which is, to say the least, very doubtful, was known by the name of Langham’s entry, which circumstance was calculated to confuse and deceive rather than to .aid subsequent locators.
*400 A careful examination of the whole testimony, relating to those entries, leads to the following results: That Opossum run, the only important call in the first entry, did not acquire notoriety till after that entry was made, and that if it had been notorious it was not a good locative call. That at the time Stokes entered, Chilton’s entry was not generally known. That as far as it was known it was called Langham’s entry, and that the lower line of that entry, called for by Stokes, was an. open line, and could not be found without ascertaining the precise situation of every part of the entry. Much of the defendants’ argument, in relation to Stokes’ entry, is predicated on the assumed fact, that Chilton’s entry had been surveyed before the entry of Stokes was made; this, however, as has been shown, was not the case. But. if it should be admitted that Langham had made a survey, as contended, it was unofficial, and not recorded, nor was it called for by Stokes. He calls for the lower line of Chilton’s entry, which line was run in 1810. Till that period, there was no such line in existence, and yet it is relied on as an object of notoriety to sustain an- entry in 1807, about three years before it was run. The age of this line, and consequently of the survey, is also ascertained by the blocks *taken, and returned by the surveyor, from which it appears to have been marked in 1810 or 1811. Were it necessary to pursue this part of the case any farther, reference might be had. to the discrepancy between the objects described in the entry of Chilton, and those actually found on the ground, and to the situation of Stokes’ entry, as it has been surveyed, which appears, from the diagram before us, not to touch any line or point in the entry or survey of Chilton.
The next and last point to be disposed of, is the date of the defendants’ surveys.
It is contended that their entries were actually surveyed before-the date of Means’ entry; and that they are, therefore, protected by the act of Congress of March, 1807.
This objection is positively contradicted by the record evidence before us. The survey of Chilton’s entry was made by N. Massie,. on August 30, 1810, and that of Stokes was made on December 10, 1811, as appears from the records in Col. Anderson’s office, certified copies of which are on the file of papers in this case. The ■entry of Means was made in May, 1808, and surveyed in June, 1809. But the defendants seem to rely on a supposed survey, made *401 by Langham, about the date of the entry. To this it may be replied, in the first place, that there is no conclusive evidence of such a survey. The witnesses say something of Langham’s surveying, but none of them state that he made a regular survey of the whole entry; and the notes taken by him at the time are strongly presumptive that he did not. They show that the lines and corners, generally, were not marked. But if he had made a complete survey at that time, it would not alter the case.
1. Because he was not a deputy, and had no authority to survey.
2. Because there is no such survey recorded.
3. Because the defendants, or those under whom they claim, have relied on the survey of Massie, and made it their own, by recording it, and making it the basis of their legal title.
If that be not their survey, the patent has improperly issued.. Admitting that Langham had made private ^surveys of these entries in 1807, and Massie, relying on his correctness, and to save himself trouble, adopted and certified them as his own in 1810 and 1811, they certainly received all their validity by that adoption, and could operate as surveys only from that time.
The position taken by the defendants goes to destroy the distinction between the acts oí authorized and unauthorized surveyors, which is inadmissible. An official survey is an indispensable link in the chain of title. Such a survey can not be made by a person who has not been legally appointed and qualified, for reasons that are too obvious to be questioned. Every person concerned in the transaction, whether as surveyor, marker, or chain carrier, must be appointed and sworn as the law directs.
From this view of the subject, the complainant is entitled to a decree for such of the land claimed by the defendants as is covered by his amended entry, and the survey in pursuance of it.