Cakjr, J.
Several points were relied on by the counsel for the appellant, for the reversal of the decree.
It was first insisted, that the statute of February 1818, incorporating The Successors of The Loyal Company, and enabling them to sue, was unconstitutional. I have examined this point with the care especially due to objections striking at the powers of legislation, but can find no ground for its support. The statute invades no contract, touches no right, affects no privilege of the defendant. It merely enables the plaintiff's to sue. We decide the controversy by the same facts, the same legal and equitable principles, as if the act had never been made.
It was next objected, that after the lapse of so many years, we are bound to presume, that the dues claimed by the plaintiffs have been paid. But is this, in truth, a case for presumption ? By the original contract, the settler was to be put in possession of the land survej^ed for him ; and the company to hold the legal title as a security for the dues: no time of payment was specified. The settler, of course, would not think of paying, until the company could perfect his title; and this they never could do, until after the decision of the court of appeals in 1783. So soon as that decision was made, we see that the company, by depositing the surveys with the register, and paying up the composition money and patent fees, clothed itself with the power to give perfect titles to all settlers, who should pay up their dues; and the case agreed states, that on such payment, the patents uniformly issued. If this defendant had made such payment, would he not rather have taken his patent from the company, without any further expense, than have bought a treasury warrant, entered the land, had a survey made, returned the works, and taken out a patent, at a good deal of additional trouble and expense? But why argue this point ? It is set down in so many words, among the facts agreed, that on this survey, no patent has issued, nor have *638 the fees and dues been paid; and though there was an understanding, that “ the agreement of the defendant, that the fees and dues had not been paid, was not intended to deprive him of the benefit of any presumption that might arise in jaw or equity, from the length of time,” this cannot weaken or destroy the effect of the admission. The fact of nonpayment still stands admitted: its weight was matter for the court, and must of necessity destroy all presumption of payment arising from time.
A third objection was, that the adverse possession of the defendant and those under whom he holds, for twenty years, presents a complete bar. But this is not a claim to the land: it is a claim to the purchase money, secured on the land; secured too, not by that lien merely, which is raised by equity, in the absence of all compact, but a lien raised by the express agreement, that the settler should hold the land, and the company the title, as a security for all dues. This assimilates the case to that of mortgagor and mortgagee, to which, we know, no act of limitation applies. And as to the adverse possession spoken of, I can hardly conceive, how a mortgagor can so chauge his position, as to render his possession adverse to his mortgagee, and thereby affect the lien he has given. There would be a violation of contract and of good faith in such an attempt, which equity would never tolerate.
It was objected, fourthly, that The Loyal Company having failed to file a caveat against, the issuing of a grant to John French, have lost their lien. The caveat is a summary remedy by statute, to arrest a party in his progress to a grant, and applies to cases of two kinds ; 1. where there is some defect in the works of the adversary, or failure to return them in time; 2. where the caveator “ hath by law, a better right.” It was not suggested, that there was any ground for a caveat, on the first point; but it was insisted, that the company ought to have caveated, on the ground of better right. But what better right had they to the land ? None whatever. By their agreement with settlers, each survey was made in the name of the individual, and to him or *639 his assignee the patent must of course issue. They had only a lien on the legal title for their dues. Thus, they could neither present a better right in themselves as a foundation for a caveat, nor make the oath required by law, “that the caveat was really and honá fide made, with an intention of procuring the land for themselves, and not in trust for the benefit of the person against whom the caveat was entered.” Look at the facts: the survey was made by the company for Johnston in 1775; he sold, assigned and transferred his right and interest in the survey and land to James Payne; by descent it came to another Payne, who sold his interest in the land, and assigned the survey to John French. By this purchase, French became a holder of the land under the company, precisely as Johnston had held it; the survey which constituted his only title, expressing that it was a part of the grant to The Loyal Company. While holding thus, John French laid a treasury warrant on this land, and had it surveyed. How could the company have caveated him? in whoso name? In their own, it seems admitted, they could not. Could they use the name of Johnston, their original settler ? clearly not; for he had long before parted with his whole interest in the land, and if had come by regular transfer to the same John French- Could they make French the caveator ? Try it: Let no grant issue to John French for 99 acres of land, lying &c. because the same John French claims the same land by a survey made for James Johnston in 1775, under The Loyal Company, which survey has been regularly assigned to the said French.” Does not the absurdity strike every one at once? The same person caveator and cavealee, plaintiff and defendant! .And does not this view of the case shew, that the grounds on which The Loyal Company now claim relief, are such as could not be used by them on the trial of a caveat ? thus presenting the very case, in which, by the express declaration of the court, in Noland v. Cromwell, 4 Munf. 155. the issuing of a patent will not preclude a party from relief in equity. But, there is another ground on which the failure to caveat has been *640 held to be excused; the ground of actual fraud. The case of Noland v. Cromwell, according to my understanding of it, does indeed decide, that actual fraud, will not excuse from caveating, unless the party can shew, that he was prevented by fraud or accident from prosecuting his caveat: and this I laboured, with all my might, to establish as the doctrine of that case, in the case of M’Clung v. Hughes, 5 Rand. 453. Yet, as (in this last case) the court after a most elaborate examination of this very point, and a review of every case, which had been decided on the subject, either by-the federal court or this court, came to the decision (three to one), that where there was actual fraud in obtaining the patent, the party against whom it was practised, might have relief in equity, though he shewed no excuse for failing to caveat, and that this was the true meaning of Noland v. Cromwell. I feel that it is due to the decision of my brethren, and to the repose and quiet of the subject, to take this as the settled doctrine. Applying it to this case, no one, I presume, can doubt, that in taking out a patent, under a treasury warrant, for the same land which he was holding under The Loyal Company's survey, and thus attempting to deprive them of their lien and their dues, John French committed a palpable fraud.
We come then, to the objection, that David French is a bond fide purchaser of the-legal title, for a valuable consideration, without notice.
' It is a well settled principle, that he who can place himself upon this ground, need never fear the action of a court of equity: he has the law, and you cannot touch his conscience : but the party who means to defend himself on this ground, must deny, on oath, the fact of notice, and every alleged circumstance from which notice can be inferred. Mitf. Plead. 215. 216. Jones v. Thomas, 3 Cox’s P. Wms. 243, 4. and note there. Jerrard v. Saunders, 2 Ves. jr. 456. Wallwyn v. Lee, 9 Ves. 31, 2. With a view to this point, I looked for the defendant’s plea and answer, but there are none in the record; and I must presume, that the plaintiffs waived the filing of them, by their assent to try the case on the agreed facts.
*641 It was strongly insisted in the argument, that the defendant is not the purchaser of the legal title, because under the peculiar circumstances of the case, the grant to John French did not carry that title. My impression is, that it did, and that such is the law under the decisions of this court; but I shall not discuss the question ; for taking the defendant to be a purchaser of the legal title, I consider him a purchaser with notice of the plaintiffs’ equity, and therefore subject to it. The reasons for this opinion, I proceed to state, as briefly as I can.
The notice which is spoken of in equity, has, I conceive, nothing technical in it, but is founded on the great principles of common sense and practical justice and utility. Many cases occur, where it is important to ascertain whether a party had notice of certain facts or circumstances: whether he had such notice or not, is a question of fact, and may be established by direct and positive proof, or by the proof of other facts which satisfy the mind of its existence. I have seen nothing more clear and satisfactory on this subject, than what is said by lord Erskine in Hiern v. Mill, 13 Ves. 120. “ .Notice is of two sorts : actual notice, which must be proved, as any other fact; and notice by construction of law, as where notice to an agent is notice to the principal, if the agent comes to the knowledge of the fact, while he is concerned for the principal, and in the Course of the very transaction which becomes the subject of the suit. The rule as to notice arising from lis pendens is a positive rule of. law, made to prevent purchases of litigated titles. Another case is, where the law imputes that notice, which, from the nature of the transaction, every person of ordinary prudence must necessarily have.” In the case of Hill v. Simpson, 7 Ves. 152. there is a direct recognition of the principle, which is laid down in many cases. In Taylor v. Stibbert, 2 Ves. jr. 437. lord Roslyn states it thus—“ 1 have no difficulty to lay down, and am well warranted by authority, and strongly founded in reason, that whoever purchases an estate from the owner, knowing it to be in the possession of tenants, is bound to inquire into the estates those tenants have. It has *642 been determined, that a purchaser being told, particular parts of the estate were in possession of a tenant, without any information as to his interest, and taking for granted it was only from year to year, was bound by the lease that tenant jmcj. which was a surprize upon him. That was rightly determined; for it was sufficient to put the purchaser upon inquiry, that he was informed the estate was not in the actual possession of the person with whom he contracted; that he could not transfer the ownership and possession at the same time; that there were interests, as to the extent and terms of which, it was his duty to inquire.” And in Hiern v. Mills, lord Erskine charged a purchaser with notice of an equitable lien, because when he bought, the title deeds were not in possession of the vendor, but of the person who afterwards filed the bill to enforce his lien. He said—“A purchaser must look to his title; if the vendor, being asked for his deeds, acknowledges that he has not got them, the purchaser is bound to make further inquiry.” In Daniels v. Davison, 16 Ves. 249. 17 Id. 433. Daniels had entered into an agreement to buy land of Davison ; he was also in possession as tenant; but the legal right was in Davison ; Cole bought of Davison, and took a conveyance; then Daniels filed his bill, for a specific execution of his agreement, making Davison and Cole defendants; Cole denied all notice: but lord Eldon decided, that the possession of Daniels made it incumbent on Cole to inquire; and so charged him with notice of the agreement; and after much argument, and citing many cases, he concluded thus—“My opinion therefore, considering this as depending upon notice, is, that this tenant being in possession under a lease, with an agreement in his pocket, to become a purchaser, those ciricumstances, altogether, give him an equity, repelling the .claim of a subsequent purchaser, who made no inquiry as to the nature of his possession. That was the doctrine laid down by lord Roslyn in the case to which I referred (Taylor v. Stibbert), and I think it right.” And when Daniels v. Davison came again before the chancellor, he said—“ I have already expressed my opinion, that the plaintiff is enti *643 tied to a specific performance of the agreement, for the sale of these premises to him ; and with regard to the subsequent sale by the defendant Davison to the other defendant Cole, my notion is, that the plaintiff has an equity to have a conveyance, of the premises from Cole, upon the ground that Cole must be considered, in equity, as having notice of the plaintiff’s equitable title under the agreement; that Cole was bound to inquire; and therefore, without going into the circumstances, to ascertain, whether he had, or had not, actual notice, he is to be considered as a purchaser of the other defendant’s title, subject to the equity of the plaintiff, to have the premises conveyed to him, &c.” These cases shew, that there is no difference in the effects of notice, whether it be actual or constructive: in both cases, the purchaser is equally subject to the equity. They shew also, that wherever ordinary prudence would suggest an inquiry, notice is imputed by the law, and the party charged with every thing of which the strictest inquiry would have put him in possession. The case of Daniels v. Davison is very strong to this purpose: for there, the possession of Daniels was as tenant under a lease, and gave no intimation that he had in his pocket an agreement to purchase the property ; yet as this possession made it incumbent on Cole, in common prudence, to inquire into his claims, and as this inquiry would, probably, have produced a discovery of the agreement to purchase, Cole was charged with notice of that agreement. And all this is founded upon that ancient and very general rule, which vve find laid down in so many books, that “ whatever is sufficient to put a party upon inquiry, is good notice in equity;” Smith v. Low, 1 Atk. 490.
Keeping these principles in mind, let us advert to the facts and circumstances attending this case. The grant to The Loyal Company, their progress, adventures, wars with the indians, difficulties, dangers and hardships, may be considered as in some degree belonging to the public history of the country, especially of the western country. We see from their names, that the company was composed of many persons, among the most eminent and influential men of their *644 day. The quantity of land they were authorized to take up, was immense, 800,000 acres, scattered through a territory, now forming several large and populous counties. At an early day, they made many surveys in the wilderness; an(j settled upon them many hardy adventurers. These continued to increase; and when, after the revolution, the legislature came to make provision for settling the titles of claimants to unpatented lands, it found these claims worthy of particular attention, and it enacted, that they should be laid before the court of appeals, to be heard and determined in a summary way; that the attorney general should appear for the commonwealth; and that on the certificate of the court, that any claim had been by it established, the register should issue a warrant or grant thereupon &c. In pursuance of the provisions of this statute, Walker, the agent for the company in December 1779, laid before the court all the surveys made under the orders of council, amounting to 973; and in this court of the last resort, the subject depended for three years; a Us pendens between the commonwealth ahd the company. This of itself was calculated to give to these claims great notoriety,' and to call the attention of the public particularly to the'subject; a subject deeply interesting to all settlers under the company, and, generally, to emigrants then crowding to this western country. The court, at length, established all these surveys, and directed grants to issue, upon payment of the dues; which payment was promptly made, and the surveys deposited with the register, free for the inspection of all. They were also recorded in the surveyours’ offices of the different counties, in which the lands lay. It is also among the agreed facts, that ever since the making these surveys, their particular location has generally been known and well understood, in the country where they are situated, and that the neighbourhood, water courses, and other natural boundaries, are particularly described in each survey, and well known to the inhabitants of the country. In addition to this, the company had always agents, residing in and visiting the country, endeavouring by public advertisements, and personal applications, to collect *645 the dues, and giving out patents from time to time, as pay-meats were made. It is also agreed, that the defendant French himself knew before Ms purchase, that The Loyal Company’s surveys were scattered throughout the country in which his land lay: that he knew, that sundry surveys had been made for the company, in that very neighbourhood; knew also, that surveys were well bounded, and the neighbourhoods in all of them, well described, and that almost all of them could be found without difficulty; and finally knew, that they were recorded in the several surveyours’ offices, and filed in the register’s office. Under all these circumstances of public notoriety, and with all this personal knowledge, the defendant, in 1829, purchased of John French (a man of his own name, and called by the chancellor his ancestor) a tract of laud, lying in the very heart of the district covered over by these surveys; a tract, which had been actually surveyed for the company, and long held under that survey by his vendor. Is it possible, with these facts before us, to resist the conviction, that he bought with actual knowledge of the survey ? I cannot; l am compelled to believe that lie had full actual notice. It is said, actual notice is out of the question, because the agreed facts state that there was none such. This I deny; and to shew that it, is a clear mistake, 1 make the following literal quotation: “ It does not appear that the defendant had any actual notice, that the 99 acre survey was included in the land purchased of the said John French, before the purchase,—except that he knew The Loyal Company’s surveys were scattered throughout this part of the country &c.” going on to except all the facts within his knowledge, which I have already set down, and which constitute the actual notice; and shewing, distinctly, that the parties meant to admit the knowledge of the facts, and to leave to the court the question, whether they amounted to actual notice. I think they do: but if there may be a difference of opinion about this, can any body doubt, that the facts of public notoriety, together with those admitted to be known by the defendant, made it incumbent on him, in common prudence, to inquire into the title ? to *646 ascertain, whether some survey of the company did hot cover this land? The sources of information were at hand, and well known to him; and to me this part of the case seems too clear for doubt.
gut jg another ground of notice,—the lis pendens. In Worsley v. Earl of Scarborough, 3 Atk. 392. lord Hardwicke says—“ There is no such doctrine in this court, that a decree made here, shall be an implied notice to a purchaser, after the cause is ended; but it is the pendency of the suit that creates the notice; for as it is á transaction in a sovereign court of justice, it is supposed all people are attentive to what passes there.” Sorrell v. Carpenter, 2 P. Wms. 482. Walker v. Smallwood, Amb. 676. Bishop of Winchester v. Payne, 11 Ves. 194. contain the same doctrine. In Gaskell v. Durdin, 2 Ball & Beat. 169. the lord chancellor says,—“ The rule of this court undoubtedly is, that any interest acquired in the subject matter of a suit, pending the suit, is so far considered a nullity, that it cannot avail against the plaintiff’s title.” Now, in 1799, the survivors of The Loyal Company filed a bill in the high court of chancery, against some of the settlers, in which the whole history of the case is given; the fights of the company in the whole subject insisted on ; the conduct of the settlers stated,—that some refused payment of the dues on one ground, some on another; that some had got grants on the judgment of the land commissioners, and others on treasury warrants, without paying the company’s dues; and praying that in all such cases the grants might be set aside as surreptitiously issued, or the holders be taken as trustees for the company, to the amount of their dues; that where no grants bad issued, they-might issue to the company, in trust for the settlers when the dues should be paid; and that until the matter should be heard, the register should be injoined from issuing patents for any land surveyed for the company, unless upon the requisition of their agent. This injunction was granted, and has never been dissolved. Various proceedings have taken place in the suit. It was removed to the court of chancery of Staunton, returned to that of Rich *647 mond, abated as to some parties, revived in the names of the successors of The Loyal Company, and is still depending in the Richmond chancery court. It is objected, that this record is not properly before us, as not being stated to be a part of the case agreed: but we see, at the end of the facts agreed, this clause—“ If any essential fact is omitted, by either of the parties, they shall be at liberty to supply it.” We see that this record was filed and used in the court below, without objection. We must conclude, therefore, that it was under this agreement, and the objection comes too late in this court.
But it was objected, that this could be a lis pendens only as to the land held by those who were made parties to the suit. Speaking of a lis pendens, in reference to the notice it gives the world, I cannot think this objection sound. It is the subject matter of the suit, of which notice is given. Now the bill we speak of, involved the whole title, rights and interests, of the company, and it prayed and obtained an injunction against issuing patents, not only to those who were made defendants, but to every holder of a survey made for the company: and every patent issued after this, for the land contained in such surveys, was a violation of this injunction. It would have been impossible to bring before the court, all the individuals who held under the company, then probably largely upwards of a thousand.
I think upon these grounds, that the lis pendens, was also notice to this defendant. But I rest my opinion most confidently upon the other grounds of notice. I am for affirming the decree.
Cabell, J
Most of the objections taken to the decree, by the counsel for the appellant, seem to me to have no foundation. 1. The statute incorporating The Successors of The Loyal Company, affects not in the smallest degree, the rights and obligations of the parties. It relates merely to the remedy for asserting and enforcing them, which has always been regarded as a legitimate object of legislation. 2. The presumption that the dues of the company have *648 been paid, is repelled by the facts agreed by the parties. If they had been paid, French would have taken out a grant upon the survey made for him by the company, rather than encounter the useless trouble and expense of laying a war-ran(. on t[le land, and surveying it anew. 3. The claim of the company being only to an equitable lien on the land, and not to the land itself, cannot be affected by the adverse possession of French; and the length of that possession can have no other operation than to create a presumption of payment; which presumption, however, is repelled, as has been observed, by the other facts in the case. 4. It was contended, that the company have lost all other remedy, in consequence of their failure to file a caveat against the emanation of the grants to John French. This pretension is based on the supposed effect of the decision in the case of Noland v. Cromwell, 4 Munf. 155. But that case was reviewed and expounded in M’Clung v. Hughes, 5 Rand. 453. and it was solemnly held, after very great consideration, by three judges out of four, that according to the case of Noland v. Cromwell, the failure to file a caveat, even when not caused by fraud, accident or mistake, does not preclude a resort to a court of equity, where the party obtaining the grant, has been guilty of actual fraud; and moreover, that he is guilty of actual fraud, who, knowing another’s prior equity, proceeds to get a grant for the land. If this be law (and it must be law, unless the power to expound its own decisions be denied to this court) it is clear, that the company lost nothing by their failure to caveat John French; for, as he had held the land under the company, he must have known their equity, and he was guilty of a gross fraud in seeking to evade his obligations to them, by getting and conveying away the legal title.
, Having disposed of these minor points, we come now to the great, and indeed, as it seems to me, the only real question in the cause; namely, whether David French, the appellant, is a bond fide purchaser of the legal title, for valuable consideration, without notice 1 If he shall be found to occupy this ground, it is admitted that he must prevail. And *649 it is equally clear, that if he had notice of the prior equity of the company, he will he as much bound by that equity, as John French, from whom he purchased.
In the investigation of this important question, we are met, on the threshold, by an objection that John French did not acquire the legal title by his patent, and consequently could not convey it by his deed, to David French. This objection is founded on the pretension, that the lands surveyed for the company, were not such waste and 'unappropriated lands, as were subject to location under land office treasury warrants. If this exemption from location be allowed to the surveys of The Loyal Company, it may be claimed, with equal propriety, for all the other surveys and inchoate rights to land, recognised and declared valid by the statute of May 1.779, for adjusting the titles of claimers to unpatented lands, under the former and present government, 2 Rev. Code, App. II. ch. 4. p. 354. Whether any of them are entitled to this .exemption or not, depends on the just construction of that statute, and another of the same session, for establishing a land office and ascertaining the terms and manner of granting waste and unappropriated lands: Id. ch. 5. p. 365.
■ Before the revolution, all the lands in the country belonged to the king, until granted out by him. There were then, as now, various and successive steps necessary to be taken for the purpose of getting a grant for lands; such as locations or entries, surveys &c. &c. These various steps gave incipient rights, or equitable interests in the land; and he who took the first legal step, acquired thereby a preference to a grant, provided he followed it up properly. But it was the grant only that passed the legal title. At the revolution the commonwealth succeeded to all the rights of the king, in relation to land. In 1779, the legislature, desirous to encourage the migration of foreigners to the country, promote population, increase the annual revenue, and create a fund for the payment of the public debt, established by the second statute above referred to, a land office, for the purpose of granting lands within the commonwealth, and prescribed *650 the manner and terms, on which any person might acquire title to so much waste and unappropriated land, as he might desire to purchase. He was, in the first place, to pay to the treasurer, a consideration at the rate of £40. for every 100 acreSj an(j then to obtain from the auditors a certificate thereof, stating the quantity of land he was thereby entitled to. This certificate was called a land warrant. It specified, however, no particular land. The holder of such a warrant, desirous to locate it on any particular waste and unappropriated land, must lodge it with the surveyour of the county, and direct the location thereof, so specially and precisely, as that others might be enabled to locate, with certainty, other warrants on the adjacent residuum. The surveyour was then to survey the land, in the time and manner prescribed by the statute; a■ plat and certificate of the survey was to be recorded in the surveycur’s office, and delivered to the party, who was, within twelve months, to return the same to the land office. Various causes are stated in the statute, for which any person might file a caveat, to prevent the emanation of a grant. But if no caveat was filed, the register of the land office was required to make out a grant, within not less than six nor more than nine months.
But there were “ various and vague claims” to land under the former and present government, previous to the establishment of the land office, which were calculated to “ produce tedious and infinite litigation and disputes,” and to discourage purchasers from taking up lands upon the terms prescribed by the statute establishing the land office. It, therefore, became “just and necessary, as well for the peace of individuals, as for the public weal, that some certain rule should be established for settling and determining the rights to such lands, and fixing the principles upon which legal and just claimers should be entitled to sue out grants; to the end that subsequent purchasers and adventurers might be enabled to proceed with greater certainty and safety.” The legislature, therefore, took up this subject, and acted on it, in the statute first above referred to. It declared valid, various classes of surveys of waste and unappropriated lands, *651 regularly made by legally commissioned county surveyours, and founded on certain rights therein mentioned. It dedared, that all persons claiming lands under surveys thus made valid, and against which no caveat had been entered, should, upon the plats and certificates of survey being returned into the land office, be entitled to grants for the same, in the manner therein after prescribed. It then went on to establish certain rights still more inchoate than surveys, such as entries, settlement rights, and pre-emption rights founded on actual settlements.
These two statutes of May 1779 are not only in pari materia, but wore passed in the immediate contemplation of each other, and probably on the same day. In proof of this, it may be observed, that the first section of the statute for settling the titles of claimants to unpateuted lands, speaks of the terms “ lately prescribed by law” for acquiring lands; referring, evidently, to the terms prescribed in the other statute of the same session, for establishing the land office. I say the reference must have been to that statute, because no other law had been passed on the subject of acquiring lands since the change of government. The first statute refers, also, in various parts, to the land office as having been already established; and, in one instance, refers to the statute by which it was established, as an act that had already passed, giving its title verbatim. The statute establishing the land office, also refers to that for settling and adjusting previous claims to unpatented lands, and quotes its title verbatim. It is manifest, therefore, that these two statutes ought to be regarded and construed, as different parts of one and the same statute.
What then did the legislature mean by “ waste and unappropriated lands,” on which the holders of land warrants were authorized to locate them? Did it mean lands to which no other person had a prior, but incipient right, as by entry or survey ? or did it mean unpatented lands ? Did it mean, in the first place, that lands legally located or surveyed on land office treasury warrants, ceased to be waste and unappropriated, so that no subsequent location could be *652 legally made thereon, and that all patents obtained on such subsequent locations, for lands covered by prior locations, were necessarily void ? Let the decisions of this court, whose province it is to expound the statutes, answer these, questions.
It has never been doubted, that a person getting the first patent, on- a survey founded on a land ofiice treasury warrant, gets thereby the legal title, notwithstanding another person may have made a prior legal location and survey, on a similar warrant. And it has been decided very frequently^ and I think uniformly, that even a court of chancery can give no relief against such patent, unless the owner of the prior entry or, survey had been prevented from filing a caveat, by fraud, accident, or mistake; or unless the person who got the first patent, had been guilty of actual fraud. The cases on this subject, as also the reasons for the decision, will be found in Noland v. Cromwell, and in M'Clung v. Hughes. And it has been frequently decided, also, that the first patent carries the legal title, even when it has been fraudulently obtained; but a court of equity will consider the patentee, in such case, a trustee for the owner of the prior entry and survey, and will compel him to convey the legal title accordingly. Indeed, I understand the counsel for the appellees as admitting these positions, when applied to cases where the senior entries and surveys are founded on land office treasury warrants. They insist, however, that they are not applicable to surveys and other rights to land, which existed before the establishment of the land, office, and which were declared valid by the statute which settled and adjusted such claims. Let us then inquire, whether such surveys and rights form an exception to the general rule.
We have seen that the two statutes of May 1779, so often referred to, are to be regarded as one act; and we have seen that, according to the decisions of this court, the terms “ waste and unappropriated lands,” include lands to which persons may have valid claims under locations and surveys on land, office treasury warrants, acquired under the autho *653 rit,y of the general land law. Upon what principle of sound construction can we say, that the same terms shall not in-dude lands covered by locations and surveys declared valid by the other statute ? It cannot be pretended, that incipient claims to land acquired under the authority of the general land law, are less valid, than the incipient claims declared valid by the other statute. Why then shall we extend to the latter, a privilege (exemption from location) which is denied to the former ? To have exempted either class from location on land warrants, would have operated injuriously to the public, by preventing or retarding the sale of the public lands: for persons would have been discouraged from becoming adventurers or purchasers, if they had believed that their titles might be defeated at subsequent and remote periods, by the exhibition of these dormant claims. The same policy applied to both classes of claims, and both should be subject to the same law, making the lands, in both cases, liable to subsequent location. This liability, while it advanced the public interest, would do no injury to the diligent prior claimant; for his rights might be always secured by a resort to the courts of caveat; tribunals wisely provided for the adjustment of conflicting claims to land before the emanation of grants.
But this point does not rest on reason only. There is authority, also, for the opinion, that lands covered by claims declared valid by the statute for settling claims to unpatented lands, are not less liable to location on land office treasury warrants, than lands covered by valid claims acquired under the general land law. I allude to the case of Burnsides v. Reid, 2 Wash. 43. Both parties, in that case, claimed under settlement and pre-emption rights; and the claims of both were submitted to the court of commissioners, established by the statute of 1779. That court decided in favor of Burnsides, giving him 400 acres for his settlement, and 600 acres for his pre-emption. Reid filed a caveat in the general court, to prevent a grant to Burnsides ; and that court reversed the judgment of the court of commissioners, and gave judgment in favor of Reid, for 400 acres for his *654 settlement, and 600 acres for his pre-emption. After this, Burnsides obtained an injunction from the high court of chancery, to prevent a grant to Reid; and pending this controversy, fraudulently obtained a patent for 1200 acres, foun(je(j 0£1 the judgment of the commissioners for 1000 acres (although it had been reversed by the general court), and 200 acres by virtue of a land office treasury warrant. The case, after having been decided in the court of chancery, was ■brought up to this court, which decided in favor of Reid, and decreed that Burnsides should convey to him so much of the land covered by his patent, as should be found to interfere with Reid’s 1000 acres. This case, therefore, proves that a patent, although fraudulently obtained, and founded partly on a land office treasury warrant, conveys the legal title, even against a person having a valid claim, under settlement and pre-emption rights, established by the first statute of May 1779.
But, superiour validity is claimed for the surveys of The Loyal Company, because they were established by the judgment of the court■ of appeals, to which they were required to be submitted by the statute. I am not at all disposed to detract from the force of that judgment; but I must be permitted to observe, that the section of the law referred to, shews no particular favor, on the part of the legislature, towards the claims of The Loyal Company, or of any other persons, claiming under surveys, on orders of council, or entries in the council books. It is manifest, that that section was dictated by the suspicions, rather than the favor, of the legislature, towards all such claims. It is worthy of remark, that as to all other surveys founded on rights approved of by the legislature, their validity is established by the statute itself, .directly and immediately; and on their being returned to the land office, patents were to be issued upon the usual terms, unless caveats had been filed against them. But as to surveys on orders of council, it is declared, that no claim under them shall be valid, but such only as shall be heard and established by the court of appeals. The decision of that court did no more for these claims, than what the sta *655 tute itself liad directly done for the others which were ohjects of its protection: it established their validity as between the commonwealth and the company : but they were to be returned to the land office, where patents were to be issued on them, according to the rules and regulations of the office. The investigation before the court of appeals was one to which there were no parties, but the commonwealth, and the claimants under the surveys. The statute required that the attorney general should attend the court on behalf of the commonwealth, and provided that the cases might be continued, on proof to the court, that any claimer •under the surveys was unable to attend; but it had not one word concerning those who had adversary claims. The surveys, therefore, when returned to the laud office, stood precisely on the same footing with those surveys which the statute itself had declared valid, without the intervention of the court; liable to be caveated for the same causes, and subject to the same rules and regulations.
I am, therefore, of opinion that the commonwealth’s grant to John French, conveyed to him the legal title ; and that his deed conveyed it to David French.
T have given to this branch of the subject more attention, than some, perhaps, may think it deserves: I have done so, because this point was strongly relied upon by the counsel; and because it is the one on which I felt, at first, much doubt.
David French having thus acquired the legal title, for valuable consideration fully paid, it remains to inquire, whether he acquired it bona, fide, without notice of the prior equity of the company.
Notice is of two sorts, actual and constructive. Actual notice is actual knowledge by the party, of the very matter or thing, of which he is said to have notice. It is a matter of fact, and is to be proved, like all other facts, by direct proof of the fact itself, or by proof of circumstances, from which the fact may be justly inferred.
Did David French have actual knowledge, before he completed his purchase, that The Loyal Company had any claim upon this land ?• Unless the evidence justifies us in *656 answering this question affirmatively, we cannot say that he had actual notice. And here let it be remarked, that as he has not pleaded to the bill or answered it, and as the parties have chosen to dispense with both plea and answer, and to regt cage on the facts agreed, we can know nothing of David French, except what is disclosed by the case agreed; nor can we know any thing of the information possessed by him, except what he directly admits, or what is to be justly inferred from his admissions. And, even,as to the facts which are admitted in the record, we must, in considering the subject of notice, distinguish those which are merely admitted to have occurred or existed, from those which are admitted to have been known to David French. Thus, he admits the whole history of The Loyal Company, the original and subsequent orders of council in their favor, their toils and dangers, their 973 surveys, the submission of them to the court of appeals, the judgment of that court, the possession of the land by Johnston under the survey made for him, the assignment of the survey to Payne, and then to John French &c. These facts, deemed important by the company, are admitted by-David French, because he was aware,- that if disputed, they could be proved : but he does not admit, that he knew them, before his purchase. A few short lines of the record contain every thing which he admits he knew. They are as follows: “ It does not appeaiy that the defendant (David French) had any actual notice, that the said ninety-nine acre survey was included in the land purchased of the said John French, before the purchase, except that he knew The Loyal Company's surveys were scattered throughout that part of the country; he also knew, that sundry;surveys had been made by the company in that neighbourhood; he knew, that the surveys were well bounded,» and the neighbourhoods well described in all said surveys,' and that almost all of them could be found without difficulty; he knew, that the plats of those surveys were recorded in the several surveyours’ offices, and filed in the register’s office in Richmond." Do these facts prove, that he knew, or had-notice, that the land he was purchasing, was included in, or *657 covered by any of those surveys ? It will not be pretended, that they prove it, directly or positively; and I think it is equally clear, that they cannot be considered sufficient circumstances to prove it presumptively, or by just inference. A fact is said to be proved presumptively, when such circumstances are proved, as usually attend such facts; 3 Blacks. Comm. 371. Is the general knowledge, that surveys were scattered throughout an extensive territory; that many of them were in a particular neighbourhood; that all of them were well bounded, and the neighbourhoods well described ; that almost all of them could be found without difficulty, and that all of them were recorded in the survey-ours’ offices, and in the register’s office: is such general knowledge as this, usually attended by a knowledge of the situation of each survey, so as to know the land it covers ? Every mind must answer this question in the negative. How, then, can we justly infer from these circumstances, that David French actually knew, that the land in the possession of John French, was embraced by any of the company’s surveys ? If it be said, that being about to purchase, and knowing what he confessedly did know, it was his duty, as a man of ordinary prudence, to make further inquiry, and that such inquiry would have led him to a knowledge of the equity of the company,—I reply, that even if this-were true, it would prove that he had constructive, not actual notice; for actual notice (of which only we are now speaking) depends on the knowledge which a man has, not on what he might have, were he to go in pursuit of it. A mere obligation to inquire, does not impart actual knowledge. The obligation may, as in case of other duties, be overlooked or disregarded. The inquiry may not have been made, and unless it appears to us, judicially, that it was made, we cannot judicially say, that the party had that knowledge which the inquiry only could have given. I am, therefore, of opinion, that David French had not actual notice.
I proceed, then, to inquire, whether he had constructive, notice; premising, that if he had this sort of notice, he is as *658 much bound by it, as he would have been by actual notice; for the law gives the same effect to both kinds of notice.
“ Constructive notice, in its nature, is no more than evidence of notice, the presumptions of which are so violent couvt wjp not allow, even, of its being controverted.” (Sugden 553.) It is that notice which the law imputes to a man, without regard to the fact, whether he has or has not actual knowledge of the thing, of which he is said to have notice, and even although it may be clearly proved, that he had not such actual knowledge. It is therefore essentially different, in its character, from actual notice. For although actual notice may be inferred from circumstances, or, in other words, may be proved by presumptive testimony, yet the circumstances or presumptive evidence, must be such as to convince the mind, that the party had actual knowledge of the thing of which he is said to have notice. Any thing short of such knowledge, is not actual notice; although it may, in some cases, amount to constructive notice. And whenever there is such knowledge, it is actual notice although proved by presumptive testimony.
But although the law, in many cases, imputes notice to a man, on evidence far short of that, which, if its weight only were considered, would be necessary to prove actual notice; yet, if we attend to the nature and character of the facts, which the evidence, in such cases, does establish, we shall see, that the law in imputing notice, acts with its usual justice and equity. Thus, on proof of notice to an agent, the law, at once, imputes notice to the principal; not because notice to the agent, is proof that the principal actually had notice also, but because it is a fact of such a character, that the principal ought to be as much bound by it, as if he had notice. “ For” (as the chancellor said, in Attorney General v. Gower, 2 Eq. Ca. Abr. p. 685. pl. 11.) “ the principal by trusting his agent, made his act his own, and became answerable for it; for, otherwise, a man who had a mind to get another’s estate might shut his own eyes, and employ another to treat for him, who had notice of a former title; which would be a manifest cheat.” So, likewise, on proof *659 of a fact which “ is sufficient to put a purchaser upon an inquiry,” the law imputes to him notice of that to which the inquiry would have led him; Smith v. Low, 1 Atk. 489. This is done on the principle, that as he ought to have made the inquiry, his voluntary failure to make it, shall not prejudice the rights of third persons.
If David Drench had constructive notice at all, it must be on the principle that he knew enough to put him on inquiry. Whether he was under such obligation or not, will be best ascertained by examining the cases on this head of constructive notice, and by observing the reason on which the obligation to make inquiry, has been held to exist. And I will now proceed to examine those which have been relied on, in behalf of the appellees.
Taylor v. Stibbert, 2 Ves. jr. 437. in this case, Stibbert purchased an estate in fee, with notice that it was in the hands of tenants, on a lease; but he was told by the vendor that the lease was void. The lord chancellor said—“ I have no difficulty to lay down, and am well warranted by authority, and strongly founded in reason, that whoever purchases an estate from the owner, knowing it to be in the possession of tenants, is bound to inquire into the estates those tenants have. It has been determined, that a purchaser, being told that particular parts of the estate were in the possession of a tenant, without any information as to his interest, and taking it for granted, it was only from year to year, was bound by the lease, which was a surprize upon him. That was rightly determined : for it was sufficient to put him on inquiry, that he was informed the estate was not in the actual possession of the person with whom he contracted; that he could not transfer the ownership and possession at the same time; that there were interests, as to the extent of which it was his duty to inquire.” He then observed, as to the case before him, that in addition to the general ground of the estate being in the hands of tenants, the purchaser being informed that the tenants held it under leases, he was bound to know all the contents of the leases. We cannot mistake the ground of this decision. The circumstance *660 mainly relied on as imposing the obligation to make inquiry, was the knowledge of the purchaser, that other persons were interested in the very property he was about to purchase. As to the additional ground, namely, the knowledge t[mt there was a deed of lease, I will examine that, more particularly, when I come to the cases as to notice of deeds.
Daniels v. Davison, 16 Ves. 249. 17 Id. 432. is the same, in principle, with that of Taylor v. Stibbert. It was the purchase of an estate, by a person knowing it to be in the possession of a tenant. That circumstance was held sufficient to put him on inquiry; and he was, therefore, held to take the estate subject to all the rights of the tenant, not only under the lease, but under an agreement of the tenant to become the purchaser. It was decided on the authority of Taylor v. Stibbert.
Smith v. Low, 1 Atk. 489. puts the obligation to make inquiry on the same ground. “They found,” said lord LTardwicke, “a person in possession of their estate, and that was sufficient to put them to inquire.”
In Hiern v. Mill, 13 Ves. 114. Mill being indebted to Hiern, deposited with him the title deeds of an estate, by way of security, promising at the same time, to execute a formal mortgage. One Arnold, afterwards, purchased the estate from Mill, knowing that the title deeds were not in his possession, hut in HierrHs. In his answer, Arnold denied knowledge of Hiern!s lien on the land, hut admitted that he knew he had the deeds, believing as he said, that he held • them as a security for a debt due to one Quarne. In deciding the cause, the chancellor chose, from public considerations, to rest his decision solely on the ground, that the purchaser knew the title papers were not in the possession of the vendor, but of another. He referred to the case of Taylor v. Stibbert, and said the case before him was much stronger than that. He observed, that “ land is held not by possession, but by title. A purchaser must look to his title, and if, being asked for the deeds, the vendor acknowledges he has them not, the purchaser is bound to further inquiry. In this case, Arnold, apprised that this plaintiff has the title *661 deeds of Mill’s estate, does not choose to go to the plaintiff, to inquire whether ho has a claim upon it, but purchases the estate from Mill.” The purchaser was, therefore, held to take the estate subject to the claim of the creditor. It is obvious, that, in this as in the preceding cases, the obligation to inquire, is put upon the ground, that the purchaser was acquainted with a fact, in relation to the very property he ■was about to purchase, sufficient to induce a belief that other persons had a claim upon it-
Hill v. Simpson, 7 Ves. 152. This was a case where an executor, within a month after the testator’s death, assigned to certain bankers, the assets of the estate, as a security for a debt then due to them from the executor, and for other advances which they were to make for him, by taking up his bills then actually outstanding. The bankers knew that the property assigned to them was part of the assets of the estate; but they confided in the representation of the executor, that the will had given him every thing, subject only to £ 20. and a few small legacies. This representation was false, in a material part, which the bankers would have seen, had they looked at the will. The master of the rolls said,— “ If they had looked at the will, instead of taking his representation, they would have seen that he had no right to assign the stock, till the claims under that will were satisfied; and that some of those claims were not satisfied. Common prudence required, that they should look at the will, and not take the debtor’s word as to his right under it. If they neglect that, and lake the chance of his speaking the truth, they must incur the hazard of his falsehood. The rights of third persons must not be affected by their negligence. I do not impute to them direct fraud, but they acted rashly, incautiously, and without the common attention used in the ordinary course of business. It was gross negligence not to look at the will, under which alone a title could be made to them.” We thus see, that, in this case, the obligation to make inquiry, is put upon the ground that the purchasers had notice of a will, “under which alone a title could be made to them'” So, in like manner, it has been decided, *662 in cases almost innumerable, that “ where a purchaser cannot make out a title, but by a deed which leads him to another fact, whether by description of the parties, recital or otherwise, he will be deemed conusant thereof; for it was crassa negligentia that he sought not after it: and for the same reason, if a purchaser has notice of a deed, he is bound by all its contents.” I need not multiply references on this head, but will mention Biscoe v. Earl of Banbury, 1 Ch. Ca. 287. Moore v. Bennet, 2 Ch. Ca. 246. Tanner v. Florence, 1 Ch. Ca. 259. Hall v. Smith, 14 Ves. 426. But it .is manifest, from all the cases, that a deed, the notice of which will be sufficient to put a purchaser upon inquiry, must be one, which the purchaser knew, or had good reason to believe, gave some interest in, or power over, the property which is the subject of the purchase. And, indeed, it would be contrary to the first principles of natural justice and equity, that the mere knowledge of the existence of a deed, should impose on him the obligation of looking into it, when he neither knew, nor had reason to believe, that that deed had any bearing on the subject of his purchase.
After this tedious review of the cases relied upon for the appellees, let us inquire, whether there is to be found, in the case before us, either of the grounds, which were held, in the cases referred to, sufficient to put the purchaser on an inquiry 7
In Taylor v. Stibbert, in Daniels v. Davison, and in Smith v. Low, the obligation to make inquiry, was placed on the ground, that the purchaser knew that the possession of the estate was not in the vendors, but in other persons claiming adverse interests. In Hiern v. Mill, it was put on a ground, which, in England, is deemed even stronger; namely, the fact that the purchaser knew the title papers were not in the possession of the vendor, but of another person. Neither of these circumstances is to be found in this case; for here, the vendor was in possession of the land, claiming under grants of the commonwealth, which he exhibited. In all the other cases, the obligation to inquire, is placed on the ground, that the purchaser had notice of a *663 deed or will on which the title depended, or under which he had reason to believe somebody else claimed an interest, or which gave some interest in, or power over, the estate. Does the principle of these cases apply to that before us? David French knew that The Loyal Company had surveys scattered through that part of the country, and that they had many surveys in that neighbourhood. But what reason had he to believe, that any of those surveys interfered with the land which was in the possession of John French? There is not an intimation in the record, that he had knowledge that John French had ever held under the company, or that the company had ever claimed this land as being covered by any of their surveys. The facts in the record are not only insufficient to prove such knowledge in David French, but they are calculated to shew, that he had reason to believe they laid no claim to this land. John French was in possession, claiming it under two grants, one of which was fourteen, the other twenty-nine years old. Let it he remarked, that the 973 surveys of the company, contain less than 300,000 acres of land, and that they are scattered over a territory containing more than five millions of acres. The lands covered by their surveys hear, therefore, a very small proportion to the immense quantity of waste and unappropriated lands in that extensive region, thrown open to adventurers, by the statute establishing the land office. Under these circumstances, the mere fact that John Frenchs patents were founded on land office treasury warrants, was sufficient to raise a presumption, that they did not embrace the lands of The Loyal Company; not because those lands were not liable to location, but because it is to be presumed, that adventurers, in locating their warrants, would prefer to locate them where there was no opposing legal claim. Again, the company might have prevented the emanation of grants for their lands, either by caveats or suits in chancery. Lyne v. Jackson, 1 Rand. 114. Or, if any cause had prevented a resort to either of these remedies, they might, at any time afterwards, have filed bills in chancery to set the patents aside, and subject the lands to their lien. Their failure to *664 take any of these steps, was well calculated to induce a belief, that they had no claim to the lands patented to John French, although they “had many surveys in the neighbourhood.”
j am¡ therefore, of opinion that David French was under no obligation to look into the surveys of the company; and, consequently, that he had not even constructive notice of their equity.
Nor can I think, that the case of the appellees is helped by the pendency of the suit in the court of chancery, Pendleton v. Patton &c. This court decided in the case of Newman v. Chapman, 2 Rand. 93. that a lis pendens is not notice. And even if it were notice, it would operate merely as to those who were purchasers pendente lite from a party to the suit. John F'ench was no party to that suit.
I think the decree should be reversed, and the bill dismissed.
Brooke, J.
The first inquiry in this case, is as to the effect of the decision of the court of appeals in 1783, on the entries and surveys of The Loyal Company. That decision was made in pursuance of the 10th section of the act of 1779, for adjusting and settling the titles of claimers to unpatented lands &c. under which provision the court was to decide, not only on the validity of surveys, but entries also. I think it very clear, upon the wording of the section, that the effect of the sentence of the court was limited to the establishment of the entries, as well made on the council books, and of the surveys, as well made on the entries. To give it a greater effect, would be to put the entries, as well as surveys, upon higher ground, than could have been intended by the legislature. It was to ascertain whether the entries and surveys had been properly made under the then existing laws on that subject, and not to give them any greater validity than the law gave them, that this provision of the statute referred the matter to the court of appeals. I. believe, at an early period of the court, some countenance *665 was given to a contrary construction of the section, but whatever may have been the first impressions oí] the court, I think it impossible upon a fair construction of the section, espedally in connexion with other provisions of the land laws, to give it the construction contended for. In Ross v. Keewood, 2 Munf. 141. it was decided by the whole court,, that lands claimed by The Loyal Company under entries in council and surveys, were still vacant and unappropriated lands, and of course subject to entry and survey under a treasury warrant until patents were obtained on such surveys. The entries in council, and the surveys of The Loyal Company made in pursuance thereof, cannot claim a higher rank under the several statutes in relation thereto, than a treasury warrant entered and surveyed on the terms prescribed by the general land law of May 1779. The terms on which those entries of the company were recognized, and confirmed by the court of appeals, placed them on no higher ground; and to have placed them on higher ground, would have changed the whole policy of the land laws for the settlement of an extensive region. The statutory provision on which the appellees rely, expressly excepts from its confirmation, the entries and surveys of the company that had at that time been caveated, and cannot be intended to exempt those surveys of the company not then caveated, from the operation of the caveat law: the object was to place them on the footing of other entries and surveys, and to give to the company the right to caveat interfering surveys. The surveys of the company amounted to more than nine hundred, interspersed through an extensive region of country, the settlement of which as early as practicable, was deeply interesting to the commonwealth. To have permitted the company to hold up its surveys for an indefinite time, would defeat the great object of the land laws; which was, to have all surveys carried into grant as early as possible, and subjected to the payment of taxes. And for this purpose also, and to put an end to all controversies respecting titles to unappropriated land, the court of caveat was created, and made competent to decide all controversies between par *666 ties claiming grants to waste and unappropriated lands, either on the ground of prior entry or survey, or of fraud in the opposing party, or on any other ground of law or equity; and this without an appeal to any other tribunal. Until the gurvey was carried into grant, actual or constructive notice of prior entries or surveys, and every ground of superiour right to a patent were to be investigated and adjudged in the court of caveat. After the surveys were carried into grant, unless some sufficient excuse was alleged and proved for omitting to enter a caveat against the grant, all the grounds for relief before enumerated, were unavailing. The commonwealth was not to be affected by them ; her policy was not to be interfered with, or to be affected by, the acts or omissions of parties, contending for priority of right to grants for the lands they had entered and surveyed. The party, who had pursued the provisions of the law, and obtained a grant, was entitled to the land. On these principles, the cases of Johnson v. Brown, 3 Call 259. and Noland v. Cromwell, 4 Munf. 155. were decided in this court. And I may here remark,- that I have heard one of the ablest counsel and statesmen express deep regret, that a like construction of our land laws had not been given by the courts of his state. A different construction in those courts, may account for the seemingly different construction given by the supreme court of the U. States, in a case from that state, Taylor v. Brown, 5 Cranch 234.
The case before us, then, is not to be treated as a case in which the subject on which the lien is claimed by The Boyal Company, had taken the character of property in the company by grant, in which the commonwealth had no interest: it must be considered on the sound policy of the land laws for settling an extensive region of country, and not on the general principles of equity applicable to ordinary cases.
Proceeding on this view of it, the defendant must be admitted to hold the legal title to the land which is sought to be charged with the equity of the plaintiffs. A great effort was made by counsel to liken this case t.o that of Camm *667 v. Norvell, 6 Munf. 236. and a higher compliment was paid to my opinion in that case, than it merited: but that was not a controversy for waste and unappropriated land. In that case, there had been a patent granting the lands to persons not before the court, long before the grant to Norvell on which the controversy turned; and though the land had lapsed after the prior grant to the Christians, it rvas not waste and unappropriated land, on- which a treasury warrant calling for waste and unappropriated land, could be laid. That land, having been granted by the commonwealth, though it afterwards lapsed, was not subject to location on a treasury warrant, was afterwards decided by the whole court (except myself, who did not sit) in the case of Whittington v. Christian, 2 Rand. 353. Not so the land in the case before us: the entries in council, and the surveys made thereon by the company, were not equivalent to a grant from the commonwealth. It was still waste and unappropriated land, when John French entered it on a treasury warrant. This, I think, must be admitted on the sound construction of the land laws. It would be monstrous, if it were not so. A license to the company to retain more than nine hundred surveys dispersed over an extensive country, for the purpose of securing its composition money <fcc. while the commonwealth was to receive no taxes (the lands being ungranted), cannot be deduced from the laws, or the rights of the parlies in this controversy.
Suppose these surveys had been on treasury warrants, instead of council entries, and that the survey in question had been assigned to James Johnston, on the terms on which the land in question was surveyed for him by the company, and John French had been permitted (no caveat being entered against him) to obtain a patent: it could not be insisted, that he could be affected by any stipulations of the company with Johnston. In such case, it could not be contended, that he could be affected by any claim upon Johnston to which he was subject. Even if John French had actual notice of such an equity, he would not be aflected by it in a court of equity, nor those claiming under him. He *668 had under the laws a right to enter and survey the lands if the company would not carry their survey in the name of Johnston, into grant. I know, it has been said, in M’Clung v. Hughes, 5 Rand. 453. that actual fraud practised by (¿g patentee was a ground for equity, though no sufficient excuse was alleged for failing to file a caveat; but I do not consider that decision as overruling the cases of Johnson v. Brown, and Noland v. Cromwell. In the first of those cases, the whole court consisting of five judges, (for though judge Roane was absent when it was decided, he is said by the president, to concur in the decision) decided, in the words of the president, that if Johnston had such an equity as would, on a caveat prior to the grant, have entitled him to a preference, it would be no ground for a bill to set aside the patent, unless it had been alleged and proved, that he was prevented by fraud or accident from prosecuting a caveat. On these grounds, he says, this court has sustained bills of this sort, as if on a caveat; clearly shewing, that that case was not the first in which the principle had been settled. In the other case, Noland v. Cromwell, there were three judges to two- And then came the case of M’Clung v. Hughes, in which there were three judges to one; that is, there was an additional judge to the minority of two in the case of Noland v. Cromwell. It is not then on slight grounds, that I have said that the case of M’Clung v. Hughes did not overrule the prior decisions of this court, which were made by seven judges to three. The actual fraud, if there was any in the present case, was as proper for the court of caveat, and that court ought to have been resorted to, from which there was no appeal.
It is said, that the company could not have caveated the patent to John French, as their survey was in the name of Johnston. But I think the company having the whole control of the survey, though made in the name of Johnston, might have caveated the grant to John French, in the name of Johnston, if not in their own. I have no doubt, if not within the letter of the provisions of the statute giving the remedy by caveat, the case is within its spirit, and *669 the company might, in substance, have made the affidavit required for obtaining a caveat. Having failed to caveat the grant to John French, and having alleged no excuse, they are not entitled to relief in equity, if they were claiming the land; nor can their case be made stronger by claiming a lien on the land only.
But suppose the company not in a condition to caveat, this was no fault of John French, the grantee. His right to a patent under the law, could not be affected by the acts or omissions of the company. His conscience was not affected; it was the settled law of the country, that prior entries and surveys, until carried into grant, were no obstacle to any person who took the legal steps to get a patent for the same land. It was the interest of the commonwealth that it should be so, or those holding surveys would never take out patents and pay taxes.
But what is the lien now claimed by the company ? If the land must be considered as waste and unappropriated land, until a patent is issued, according to the decision of this court in Whittington v. Christian, could Johnston or the company holding only the survey, cioath it with an equity, or subject it to any contract, which would affect the right of the commonwealth to grant it to John French, who dealt for the land only If so, upon the principles of equity, the commonwealth must be liable to the patentee, against the express law of 1748, that the commonwealth will only be responsible to a party who loses the land granted, at the rate of two dollars the hundred acres, and in no other manner. But no such pretension can be insisted on. Until the land rvas patented, it was subject to no contract affecting it: it was not subject to the debts of the holder of the survey. There are numberless cases in Avhich surveys were sold by one party to another, and this equity of vendor against vendee Avas never thought of.- It could not be extended on an elegit, or subjected in any manner to the contracts of the holder. Until a patent issued, it Avas not property; for no one had an exclusive right to it, Avhich is of the essence of property.
*670 The effort, then, to place the surveys of the company in a higher rank than surveys on treasury warrants, must fail. The clause in the statute of 1779, on which the plaintiffs rely; condemns the pretension. It recognizes the surveys, except those that had been caveated; but if they were equivalent to a grant of the land, the exception could not have been made, since the- object of a caveat is to prevent the issuing of a grant, not to set one aside.
If then the plaintiffs were claiming the land, they could not succeed, and claiming a lien on waste and unappropriated land, they must fail.
On these grounds, I think the decree ought to be reversed, and the bill dismissed. But suppose the survey of the company was placed on higher ground by the decision of the •court of appeals in 1783, than surveys on treasury warrants; still, the legal title remained in the commonwealth; and though it was admitted, that it resided there for the company, yet having been granted to John French by the commonwealth, David French, who claims under him, is not to be affected by the claim of the company, unless it be shewn that he had notice of the claim, before he paid his purchase money. Having the legal title, upon no principle of equity can he be affected by it. That the legal title was in the commonwealth, is admitted by the bill in the high court of chancery, injoining the register from issuing grants to those holding surveys, until they paid the composition money &c. By the agreed case, it is admitted, that he had not actual notice of this equity. The facts of which he was informed, as admitted in the agreed case, could not have the effect to put him on inquiry as to this equity. If he were now in a court of caveat, and the right to a grant from the commonwealth was in question, they might have that effect. I think they gave no constructive notice to David French. On this point, I refer to the cases cited by judge Cabell, and to his application of them to the facts relied on in the agreed case..
As to the lis pendens, that can never be considered as notice; its operation on purchasers of anyof the subjects in *671 controversy, is of an entirely different character. It is true, it is called a notice by the gravest judges; but its whole object is to keep the subjects in controversy within the power of the court, until the decree is entered, and to prevent further suits for the same subjects; which must be the case, if the purchaser pendente lite was permitted to take the subject out of the power of the court. A Ms pendens, to have the effect contended for, must be judiciously and diligently prosecuted. In this case, the Us pendens appears to have commenced in 1799; when, and whether any subpoena was issued, does not appear. The order injoining the register from issuing patents, was not entered until 1821, long after John French had obtained a patent for the land. Until this order, the lien now claimed (Johnston being no party) was not one of the subjects in controversy. Until the order injoining the register not to issue patents to any of the holders of surveys, the lien on this land was not a subject of controversy in that suit. However that may be (for the record is very imperfect), I think the lis pendens, prosecuted as this was, could not affect the rights of David French, the appellee.
As to the presumption of satisfaction of this lien after the lapse of more than fifty years, I do not think it is repelled by the fact that no patent was to issue until it was discharged, and the fact that no patent was issued in this case in behalf of the company. The lien may have been discharged by Johnston or Payne, though they neglected to take out a patent. The allegation in the bill, that the company had successive agents to collect their dues, corroborates the presumption of payment, and is of full as much weight as the fact that no patent was issued on behalf of the company.
Both upon the policy of the land laws, and the general principles of equity, I think the decree must be reversed, and the bill dismissed.
Tucker, P.
David French, the appellant, in the year 1829, purchased of John French the lands sought to be charged in this suit with the demand of the appellees, and *672 paid the purchase money in full. The appellees asserting a lien upon those lands, the appellant defends himself upon the ground, that he holds the legal title, and purchased without notice of the rights of The Loyal Company. The of this defence is to be inquired into.
John French, from whom David French made his purchase, procured patents from the commonwealth in 1800 and 1815, which cover the land in question. But it is contended by the counsel for the appellees, that those patents are null and void, because they comprehended lands which had long before been appropriated to The Loyal Company, by an order of council followed up by survey and confirmed by legislative enactments.
That the patent of the commonwealth passes the legal title to the patentee, cannot, as a general principle, be denied. The whole structure of our land law, the scheme for disposing of the public domain, and the course of our adjudications, place this matter beyond doubt. “ Any person may acquire title to so much waste and unappropriated land as he-shall desire to purchase,” upon the terms and conditions prescribed by law: and when he has • duly taken the preliminary steps pointed out by the land law, he is entitled to receive a grant from the register, upon which shall be indorsed that the party hath title. In the construction of this statute, the courts have uniformly held, that a prior entry and survey do not amount to such an appropriation of the land, as will render void a patent obtained by a junior locator. That this was a correct interpretation, cannot, I think, admit of doubt. The provisions of the statute not only contemplated the possibility of interfering locations, but provide also a summary tribunal for deciding between the inchoate rights to unpatented lands. The caveat court was established expressly for the purpose of determining those litigations about the right to a patent, which it was easily foreseen must inevitably arise. There was no provision in the statute declaring void all patents issuing upon entries and surveys, which interfered with previous entries, nor was the arduous and impracticable duty devolved upon the register, of *673 deciding between conflicting claimants. That task was imposed upon the courts; and it has by them repeatedly been decided, that where the party who has the prior entry and survey' has failed to resort to his caveat, without an adequate excuse for the omission, his remedy is gone; the junior locator who holds the prior patent, has the better title at law, and shall not be disturbed in equity. The validity of the patent of the junior locator, is thus distinctly admitted, although it covers land which may have been appropriated by prior entry and survey. 5 Rand. 478. 479. 480.
Upon general principles, it, could not have been otherwise. A warrant, entry and survey, like contracts to sell and convey, give but an equitable right. The warrant is the first step towards procuring a grant; but before an entry with the surreyour, there is not even an incipient right to any particular parcel of land : the entry is the first legal step towards the acquisition of title to any specific tract. The survey is the next progressive legal step towards the acquisition : but it is the grant only which confers the legal title. 3 Call 267. The warrant, entry and survey', authorize the proprietor to demand the grant; but do not, in themselves, confer it. Until it is consummated by the grant, he has but an equity, 7 Wheat. 1. 6. The legal title remains, therefore, in the commonwealth, until the emanation of the patent shall have passed it to her grantee. In the case, then, of two adventurers, if the prior locator has permitted his adversary, though junior, to obtain a patent, that patent will vest the legal title in him, subject, indeed, to examination in a court of equity, but of unquestionable validity in a court of law. For, it is issued by the register, by the express mandate of the statute. It is not for him to examine or decide, whether there is an interference of boundary, or a superiority of claim, on the one part or the other. He issues a patent to each party whose proceedings have been regular. If there be a contest at law, the senior patent prevails; and it cannot be there avoided, even by shewing a regular prior entry and survey. But such prior right may be asserted in equity, and the junior locator may there be compelled to *674 transfer the legal title (which he has improperly acquired) to his adversary who has proved himself better entitled to it.
These are elementary principles, and would not have been so particularly stated, but that they seem to have been lost gjg-ht 0f jn the argument. In the eagerness to establish the invalidity of the act of the register in this instance, the counsel seem to have insisted upon positions so broad as to have interfered with the best received doctrines in reference to our land titles.
That there may be cases in which the patent of the commonwealth will pass nothing, cannot be denied.- One class of cases of this description, is of every day’s occurrence. If there be two patents for the same land, and the senior patent be valid, the junior patent passes nothing: nihil operatur; there is nothing to pass. But nothing short of a patent can so extinguish the commonwealth’s title, as to render the junior patent void. The warrant, entry and survey do not; for they are but inchoate. The legal title still remains in the commonwealth; and it cannot, therefore, be affirmed of the patent in this case, nihil operatur; as may safely be affirmed where there has been a prior patent.
It was upon this principle, it seems, that Mr. Wickham mainly relied in the case of Camm v. Norvell, 6 Munf. 233. He contended, that as the land had been once patented, although it had been subsequently forfeited, yet the subsequent, patent of the commonwealth operated nothing. It seems, however, from the case of Whittington v. Christian, 2 Rand. 353. that there were other irresistible reasons for considering the last patent, in that case, utterly void, even at law. So too, in the case of escheated lands, it has been held, that a patent granting them is void, even at law, if the fact appear upon the face of the patent; Alexander v. Greenup, 1 Munf. 134. For, in such case, the subject of the grant was not waste and unappropriated land. It had ceased to be so, by having been withdrawn by the first proprietor, by his patent, from the class of the unappropriated domains of the commonwealth. It was not within the meaning and contemplation of the legislature, that lands so circumstanced, *675 should be considered as comprehended by the provisions of the general land law : and so the courts have regarded the matter. The distinction is clearly adverted to, between these cases and the case of adventurers having entries and surveys on the waste and yet ungranted lands of the commonwealth. Thus, in Camm v. Norvell, to say nothing of the opinion of judge Roane, who was decidedly opposed to impugning the patent, judge Brooke, who thought otherwise, in a very lucid opinion, explains the grounds on which that case rested. He observes,—“Upon principle, a forfeiture could not he pronounced by the register of the land office, and the governor who executed the patent to Norvell. And if it could, land before patented and forfeited, could not be converted into waste and unappropriated land, to be located upon a treasury warrant under the act of 1779. The error is, in supposing a case of this description analogous to the cases arising out of claims to waste and unappropriated lands under the act of 1779.” As to those, then, it would seem, the learned judge did not suppose a patent void, because it covered a prior entry and survey. Again, he says,—“ The act of 1779, only holding out the right of any citizen to appropriate waste and unappropriated land on the terms of that act, without a compliance with which no right accrued ; if the party failed to consummate his right by not pursuing the provisions of that act, and another, more diligent, obtained a grant, he [the first] had no claim upon the commonwealth, except to another warrant, with which he might take other lands. It gave no equity to any one in preference to another. Until the claini to appropriate had been carried into grant, the land did not take the character of property. The case before the court, differs from the cases cited, in this, that the land in question had been, before the grant to Norvell, appropriated by a grant to the Christians’’ Here, then, we see a distinct intimation, that although a patent is ipso facto null and void, where it issues for land before patented and forfeited, yet it is not so in the case of waste and unappropriated lands, though covered by a prior entry and patent. See also judge Green’s opinion, 5 Rand. 488.
*676 Prom the general rule that the commonwealth’s patent operates to pass a title where there has been no previous patent, I see no reason to exempt the surveys of The Loyal Company. There is no case affirming their title to exempt{on * anc] there is nothing in the statute from which it can fairly be inferred. The confirmation of the rights of the company, and the provision that grants should issue upon all such surveys under it, as should be confirmed by the court of appeals, no more withdrew these lands from the common mass of unappropriated lands, than the provision that patents should issue upon surveys regularly returned, has the effect of separating them from the same common mass. The company’s surveys, like those of others, might be subject to caveat, for interference with superiour rights, or for other causes; and, moreover, being scattered indiscriminately over a large tract of country, to have utterly avoided every entry or survey which might trench upon them, would have arrested the progress of locations, and the disposition of the public lands. I cannot think, therefore, that the company surveys were so withdrawn from the stock of public lands, as to render the act of the register and governor, in granting a patent to another, who had taken up the land by treasury warrant, or claimed it by pre-emption, settlement or other right, entirely inofficious and void. When the legislature did design to withdraw a particular tract of country from the market, its will was clearly and explicitly declared, as in the cases of the lands granted to Richard Henderson cf Company, of the military reserve, of the Northwestern territory, and of the territory within the country and limits of the Cherokee indians. A grant for lands thus situated* would have been as inofficious and void, as a grant of escheated land, or of forfeited lands, under an ordinary treasury warrant. But not so, as to the lands of The Loyal Company, or of ordinary adventurers, whose claims are not fenced round with a like specific provision. These might all be the subject of litigation, and be covered by conflicting *677 claims; and neither the governor nor the register were empowered to decide between rival competitors. They could not have decided. They had not, and could not have, unless invested with power to proceed judicially, the means of deciding, whether new surveys upon treasury warrants, did or did not interfere with the surveys of the company. They were, therefore, obliged (and so, indeed, the law provided) to issue patents upon all surveys duly and regularly returned, unless caveated by adversary claimants. Nor was any wrong done by this. For, previous to the emanation of the patent, either party might demand a comparison with his adversary in a court of caveat, of their respective pretensions ; and if prevented by fraud or accident from the exercise of this remedy, a court of equity was yet open to do right between the parties. This universal rule embraced the companies, I conceive, as well as the individual adventurers. Nor have I any doubt, that if these lands had been patented to some person other than John French, the case of Noland v. Cromwell would have been strictly applicable, and have proved fatal to the rights of The Loyal Company, or of those claiming under them.
Upon the whole, I am of opinion, that the legal title to the land in question is with David French. Let us next inquire, whether he is a purchaser without notice of the claim of the company.
Notice is either actual or constructive; and it is expressly agreed between the parties, that he had not actual notice, except so far as it may be deduced from certain facts, the knowledge of which he admits. Now, these facts, set forth as having been known to him, do not satisfy my mind, that he must have known of the claim of the company to this particular tract of land. They create a strong probability, that he may have heard of the claim of the company, but they leave the matter in a state of uncertainty, which cannot furnish a proper foundation for judicial action. In short, they do not prove actual notice on the defendant.
, Then as to constructive notice. With all deference, I beg leave to say, that I do not consider constructive notice, *678 to be the proof of notice by circumstantial evidence. Where it is so established, it is express or actual notice; it is not 'constructive notice. Constructive notice, we are told, is in its nature no more than evidence of notice, the presump(jons 0f which are so violent, that the court will not allow even of its being controverted; Plumb v. Fluitt, 2 Anstr. 432. 438. This very definition is conclusive to shew, that constructive notice,—sometimes called implied notice,—depends not upon the weight of the evidence, but upon the character of the fact. And, accordingly, we find, that a party will be bound by constructive notice, even when he clearly proves that, in point of fact, he never had actual notice. Thus, notice to my agent or counsel is constructive notice to me. The law conclusively implies that I have notice, and even though I prove by my agent or counsel that he did not communicate the fact, it will not avail. So, the pendency of a suit for a slave is notice; and though I prove I was a thousand miles off, and could not know of it, yet I am held to know it, if I purchase pendente lite.
Hence, it is obvious, that unless the evidence adduced, proves some fact, from which the law will infer notice conclusively, it cannot establish constructive notice. It may conduce, indeed, to prove actual notice: it may create strong probability of actual notice: but such evidence does not even bear upon the question of constructive or implied notice, unless it establishes some fact from which the law will infer it, whether there was or was not notice in fact. Thus, the strongest circumstantial evidence to prove I knew of a prior mortgage, when I lent my money, would not make out a case of constructive notice. If strong enough, it might satisfy the mind of the fact of actual notice; but if it fell short of that, it could not prove constructive notice; whereas, if I claim under a deed, I have constructive notice of its contents, though, in point of fact, I may be entirely ignorant of them. So, in this case, the facts found, conduce to prove actual notice; but they fall short of it, and they establish no one fact, from which a notice of the main facts can conclusively be inferred.
*679 What ave those main facts? They are, 1. that these •were company lands, and so known to be by David French; 2. that he knew, that John French held under the company; 8. that he knew, that they were subject to the company’s charges; and 4. that John French had fraudulently laid a treasury -warrant on them, and obtained a patent for them. For, it would not suffice to shew even a knowledge by David French, that they were lands covered by the company’s claim, unless he also knew, that John French claimed under them, and had committed a fraud. Without this knowledge, he stands as a fair purchaser under a patent issued on a treasury right, which had been carried into grant, without being cavealecl by the company or their vendees: that is to say, he would be a purchaser of the legal title, with knowledge of a once subsisting incipient claim, which, if ever good, was extinguished by the failure to assert it in a caveat court. To fix on him notice which would charge him, there must also be brought home to him a knowledge of that fraud, which would constitute an equitable ground of relief, notwithstanding the failure to caveat. Now, in this case, I do not perceive, that any fact or facts áre proved, from which we can fairly and safely infer all the essential ingredients above mentioned, which must be combined in order to charge him.
I come next, however, to the inquiry, whether the survey under the company’s order of council for Johnston, was notice to David French of the rights of the company, or of some one claiming under them.
That the entries and surveys upon the books of the surveyour, are notice to all adventurers engaged in taking up waste and ungranted lands, cannot be denied. The surveyour’s book constitutes a record, to which every holder of a warrant has a right to resort for various purposes. Does he desire to make a location ? He resorts to the book of entries, for the purpose of being enabled to make his location, with safety', upon lands uncovered by a prior adventurer. Does he desire to prevent intrusion upon his entry, while it is yet in progress to a title ? He resorts to the surveyour’s *680 boobs, from time to time, to see whether any junior adventurer is intruding upon his prior location; and if there be, he is bound to caveat him, or he will lose his priority, if his adversary’s entry is a good one, and duly prosecuted to a patentj before he has obtained his own. And this is the case, whether he ever did see the entry or not; for it was his business to see it. In like manner, the book of entries is notice to the junior adventurer, though the consequences of its being so are not fatal, if he goes on, fairly, to obtain his patent, before the prior locator. For, the conscience of the junior locator can only be affected by actual notice; M’Clung v. Hughes, 5 Rand. 453. whereas this notice is strictly and altogether constructive.
But, although it be admitted, that the constructive notice of the prior locator’s entry and survey, exists as between the locators themselves, in their progress to the consummation of their titles by patent, yet I cannot admit, that it could apply to successive claimants under the patentee, however remote they may be in the chain of derivative purchasers. In other words, a purchaser from the patentee is not affected with .constructive notice of a prior entry. Tp maintain that a purchaser of land, for which a patent has been issued, must look back to the state of the equitable title anteriour to the patent, would be to impose a clog on alienations, most inconvenient and pernicious. If it be true as to the purchaser from the patentee himself, it must be equally true as to all derivative purchasers under him, however remote. Such a position has never been advanced, and, I think, cannot be sustained. The policy of society requires that it should be discountenanced. Though the principles of courts of chancery, often and very properly, respect these latent equities, and sustain them against the perpetrator of a fraud, or his collusive vendee, yet it would be exceedingly mischievous to permit them, at any distance of time, to start into existence, to the injury of fair purchasers. The free and untrammeled alienation of property, so much cherished by our laws, would be seriously embarrassed, if the notions of constructive notice of latent equities shall be indefinitely extended. Who_ *681 would buy, if the duty be imposed, of going behind a patent, however ancient, to see whether there was no prior entry, and if this inquiry were to be followed up by the necessity of a further examination into the equitable excuses for a failure to caveat ?■ Such a requisition would be unreasonable and pernicious; and, therefore, I cannot think it should be recognized. The purchaser from the patentee is not bound to trace back the title behind the patent, and compare entries with others, who were at remote periods competitors for the land.
If, indeed, such a doctrine could prevail, something more would yet be wanting to affect his conscience, than bare notice of the entry or survey. As the failure to caveat is fatal to the rights of the prior locator, unless there be some equitable circumstances to justify the interference of equity, a notice of the prior location alone, would only be notice of an extinguished right.
But it is contended, that the lis pendens, in this case, was notice. While there is no principle in the law more essential to the administration of justice, than the doctrine of the lis pendens, when properly understood, there is none which is attended with greater occasional hardship ; nor would any be more pernicious, if extended beyond its proper limits. These limits are so well defined, and the principle of the lis pendens so well laid down by judge Green in Newman v. Chapman, 2 Rand. 102. 103. that I may be excused for transcribing the passage:
“ The rule as to the effect of a lis pendens, is founded upon the necessity of such a rule, to give effect to the proceedings of courts of justice. Without it, the administration of justice might, in all cases, be frustrated by successive alienations of the property, which was the object of litigation, pending the suit, so that every judgment and decree would be rendered abortive, where the recovery of specific property was the object. This necessity is so obvious, that there was no occasion to resort to the presumption, that the purchaser really had, or by inquiry might have had, notice of the pendency of the suit, to justify the existence of the *682 ruie< ja fact; it applied in cases, in which there was a physical impossibility that tjie purchaser could know, with any possible diligence on his pait, of the existence of the suit, unless all contracts were made in the office from which the WJ.jt jssuec]) an¿ on the last moment of the day. For, at common law, the writ was pending from the first moment of the day on which it issued and bore teste; and a purchaser, on or after that day, held the property subject to the execution upon the judgment in that suit, as the defendant would have held it, if no alienation had been made. The court of. chancery adopted the rule, in analogy to the common Jaw, but relaxed, in some degree, the severity of the common lawn For, no Us pendens existed until the service of the subpcena and bill filed; but, it existed from the service of the subpoena, although the bill were not filed until long after; so that a purchaser, after service of the subpoena and before the bill was filed, would, after the filing of the bill, be deemed to be a lite pendente purchaser, and as such, be bound by the proceedings in the suit, although the subpoena gave him no information as to the subject of the suit. A subpoena might be served the very day on which it was sued out, and there is an instance in the english books, of a purchaser who purchased on the day that the subpoena was served, without actual notice, and who lost his purchase by force of this rule of law. This principle, however necessary, was harsh in its effects upon bona fide purchasers, and was confined in its operation to the extent of the policy on which it was founded; that is, to the giving full effect to the judgment or decree which might be rendered in the suit depending at the time of the purchase. As a proof of this, if the suit was not prosecuted with effect, as if a suit at law was discontinued, or the plaintiff suffered a non-suit, or if a suit in chancery was dismissed for want of prosecution, or for any other cause not upon the merits, or if, at law or in chancery, a suit abated ; although, in all these cases, the plaintiff, or his proper representative, might bring a new suit for the same cause, he must make the one who purchased pending the former suit, a party; and, in this new suit, such pur cha *683 ser would not be at all affected by the pendency of the former suit, at the time of his purchase. In the case of an abatement, however, the original suit might be continued in chancery, by revivor, or at law, in real actions, abated by the death of a party, by journies accounts, and the purchaser still be bound by the final judgment or decree. If a suit be brought against the heir, upon the obligation of his ancestor binding his heirs, and he alienates the land descended, pending the writ, upon a judgment in that suit, the lands in the hands of the purchaser would be liable to be extended in satisfaction of the debt. But, if that suit were discontinued, abated, or the plaintiff suffered a non-suit, in a new action for the same cause, the purchaser would not be affected by the pendency of the former suit at the time of his purchase; and, if he could be reached at law, in equity it could only be, upon proof of actual notice and fraud. If a, lis pen-dens was notice then, as a notice at or before the purchase would, in other cases, bind the purchaser in any suit in equity, prosecuted at any time thereafter, to assert the light of which he had notice, so ought the lis pendens to bind him in any subsequent suit prosecuted for the same cause; but it does not. Again; a bill of discovery, or to perpetuate the testimony of witnesses, ought., if all persons were bound to take notice of wliat is going on in a court of justice, to be a notice to all the world, as much as a bill for relief. But, these are decided to be no notice to any purpose; a proof, that the rule, as to the effect of a lis pendens, is one of mere policy, confined in its operation strictly to the purposes for which it was adopted ; that is, to give effect to the judgments and decrees of courts of justice ; and that it is not properly a notice to any purpose whatsoever. The onglish judges and elementary writers have carelessly called it a notice, because, in one single case, that of a suit prosecuted to decree or judgment, it had the same effect upon the interests of the purchaser, as a notice had, though for a different reason. But, the courts have not, in any case, given it the real force and effect of a notice.”
*684 In the present case, there is no foundation, for the application of the doctrine of the lis pendens. Neither John French, nor any other under whom David French claims, were parties to the suit instituted in Richmond. The survey claimed by Johnston was not a part of the corpus which constituted the subject of that suit. The register, it is true, was a party, but the register was only a formal party. He may have been injoined, it is true, from issuing patents, though that does not appear; but that injunction could not operate to restrain him in the case of any individual not party to the suit, nor can the court of chancery now make, in that cause, any order binding or affecting the rights of Johnston, or of Payne, or of John French, or David French. There can be no decree, in that case, as to the right ,of this survey; and I am at a loss to conceive how the lis pendens can apply, where the property purchased is not demanded, and can neither be decreed, nor in any wise affected by the determination of the case. The rights of the six persons made defendants' in that case, are alone in contest, and purchasers from them only, can be affected by a decree.
We have already seen, in the opinion of judge Green, that the lis pendens “ is not properly a notice for any purpose whatsoever.” It was not, therefore, a notice in this case. Indeed, even when it does operate as notice, it is merely as notice to the party who purchases the corpus or subject of controversy. It could not, therefore, be notice to David French, since the property he purchased was not demanded, and the person he purchased from, was not a party. Even had he been a party, the Us pendens would only have bound from the service of the subpoena; because, until then, there was no notice that he was sued. It does not appear that there ever was a subpoena served at all. What notice of his being sued,—of his land being claimed,—is afforded by this case, in which he never was a party ? Indeed, the fact that there was such a suit, is no part of the case agreed; and the court, in strictness, cannot go out of that.
*685 Upon the whole, I have no doubt, David French is a purchaser without notice, and as such is protected from the plaintiff’s demand. I am, therefore, of opinion to reverse the decree; to which, indeed, I think the company were not entitled for other insurmountable reasons. These, however, it is unnecessary to state, and it would extend this opinion, already too much expanded, to an unreasonable length if I were to attempt it. I shall therefore waive any further remark.
Decree reversed, and bill dismissed.

 In Ross v. Keewood, 2 Munf. 147. judge Tucker considers their title as clearly inchoate only.